IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 12, 2022 Session Heard at Austin Peay State University[1]

**STATE OF TENNESSEE v. JAMIE L. TICE**

**Appeal from the Criminal Court for Sumner County**
**No. 2018-CR-124      Dee David Gay, Judge**
_____

**No. M2021-00495-CCA-R3-CD**
_____

A Sumner County jury convicted the Defendant, Jamie L. Tice, of two counts of statutory rape by an authority figure and three counts of aggravated statutory rape, for which the trial court imposed an effective sentence of twenty-four years with release eligibility after service of thirty percent of the sentence in confinement.  On appeal, the Defendant argues (1) the evidence is insufficient to sustain her two convictions for statutory rape by an authority figure; (2) the State committed a Brady violation by failing to disclose payments made to a testifying witness and her husband; (3) the trial court erred in failing to provide a modified unanimity instruction in Count 4, and the evidence is insufficient to sustain her conviction for aggravated statutory rape in that count; (4) the trial court committed plain error in improperly admitting hearsay statements of the Defendant's husband, as well as the argument thereof, which violated the Defendant's right to due process and confrontation; (5) the trial court erroneously deprived her of the right of cross-examination on certain topics; (6) the trial court imposed an excessive sentence; and (7) cumulative error deprived her of a fair trial.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JILL BARTEE AYERS, JJ., joined.

Benjamin K. Raybin, Nashville, Tennessee (on appeal); and John D. Pellegrin, Gallatin, Tennessee (at trial), for the Appellant, Jamie Leigh Tice.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Ray Whitley, District Attorney General; and Tara Wyllie and C. Ronald Blanton, Assistant District Attorneys General, for the Appellee, State of Tennessee.

_____

[1] Oral Argument in this case was heard before students on the campus of Austin Peay State University in Clarksville, Tennessee.

**OPINION**

This case stems from the Defendant's inappropriate sexual relationship with the minor victim, J.J.,[2] the boyfriend of the Defendant's daughter, over the course of nearly a year. As a result, the Sumner County Grand Jury indicted the Defendant for five counts of statutory rape by an authority figure.

**Trial.** Wendy Mallard said she first met the Defendant, who she had known for ten years, while attending Metro Baptist Church, and they became "really good friends." Even after Wendy moved to North Carolina, she and the Defendant communicated frequently through text messages, social media, and phone calls. Wendy[3] said that in early November 2017, the Defendant visited her in North Carolina. The Defendant had previously told Wendy that she had begun a sexual affair, although the Defendant never disclosed the name of the individual with whom the Defendant was having the affair. However, during this November 2017 visit, the Defendant finally admitted that she had been having a sexual affair with J.J., the boyfriend of the Defendant's daughter. Wendy said the Defendant disclosed that her first sexual encounter with J.J. was "in December of 2016 when [the Defendant's] husband and children went to New York for Christmas." The Defendant explained that she and her husband had been fighting, that she did not want to go on the trip, and that she had asked J.J. to spend the night with her, stating that "they had sex many times that night and again the next morning." The Defendant said that the sex she had with J.J. was "the best sex she'd ever had" and that she had "multiple orgasms[.]" The Defendant then admitted that J.J. was fourteen years old when they first started having sex in December 2016 and that J.J. was currently fifteen years old. Wendy said the Defendant's demeanor when discussing her sexual relationship with the fourteen-year-old boy was "giddy, very excited[,] and happy[.]"

During this visit, the Defendant also told Wendy about the first time she kissed J.J., which occurred when the Defendant, the Defendant's children, J.J., and another woman were in a car, and J.J. "was discussing kissing[her daughter.]" The Defendant said she told J.J., "[Y]ou have to go through me and kiss me before you can kiss her," and J.J. "said okay and he did." The Defendant said that J.J. later apologized for kissing her, and the Defendant sat next to J.J. on the couch, "cupped his face with her hands and had him look her in the eye and . . . said, 'It's okay, I wanted you to.'" The Defendant said her relationship with J.J. "progressed from there."

---

[2] It is the policy of this court to identify minor victims and their family members by their initials only.

[3] Various witnesses share the same last name or are related throughout this opinion. We will refer to these individuals by their first names to distinguish them, and we intend no disrespect in doing so.

Wendy stated that the Defendant told her she would get time alone with J.J. by "pick[ing] him up and tak[ing] him places or through their youth trip . . . on the retreats that they would go on[.]" She also said that J.J. would spend the night at the Defendant's home, and the Defendant "would go downstairs when everybody was asleep" to spend time with J.J. The Defendant said that one night, while her younger daughter was asleep on the floor in the living room, the Defendant and J.J. "were making out beside her [o]n the floor." Wendy asked what she would have done if the Defendant's daughter woke up, and the Defendant insisted that her daughter would not have awakened because she was fast asleep.

In addition, Wendy said the Defendant told her that she had sent J.J. photographs of her "in her lingerie or bras[.]" She also asked Wendy to take photographs of the Defendant in her lingerie during the visit, but Wendy declined. During this visit, the Defendant stated that J.J. was "well endowed" and admitted to Wendy that she had sex with J.J. in several places, including the Defendant's home, J.J.'s home, in a car, and in hotel rooms. The Defendant asserted that she and J.J. had sex in "every room of her house[,]" and that the number of times they had sex was "[t]oo many to count." Although Wendy "spent 24 hours" trying to convince the Defendant of how wrong this sexual relationship was, the Defendant did not see J.J.'s "age as being a problem." The Defendant also disclosed that she did not use birth control and that she believed she was pregnant with J.J.'s baby. The Defendant said she and J.J. had been "discussing names for the baby" and the Defendant said that "if he w[ere] 18[,] she would run off and marry him" but J.J. "would have to be an adult, have money, [and] be able to take care" of her. Wendy noted that "[f]rom the moment [the Defendant] got there until the moment [the Defendant's] husband came," the only thing the Defendant would talk about was J.J. Wendy told her husband, Tommy Mallard, about the Defendant's sexual relationship with J.J., and he agreed that they had to tell someone.

Wendy also talked to her friend Dawn Lesueur about the Defendant's sexual relationship with J.J. Because the Defendant only talked about having sex with J.J. during her November 2017 visit, Wendy did not believe that the Defendant would ever end the relationship. Wendy said that she, Dawn Lesueur, and Eric Lesueur, Dawn's husband, had a conference call and decided to have the Defendant's husband, Brian Tice, travel to North Carolina so the Defendant could tell her husband about J.J., so he could handle the situation. Wendy said that Eric Lesueur bought a plane ticket to North Carolina for Brian and drove him to the airport and that Tommy Mallard picked up Brian from the airport in Charlotte.

When Brian arrived at the Mallard's home in North Carolina, the Defendant appeared to be "in shock." Wendy described what happened next:

[The Defendant] got up and ran to one of my rooms in the house and shut the door. And Brian was just sitting on the couch. He had a—my husband—he had told my husband "I think I know what this is about. It's about [J.J.], isn't it?" And my husband said, "You need to talk to [your wife]."

Wendy opened the door of the room where the Defendant was hiding, and when the Defendant gave her an angry look, Wendy told the Defendant that she could not expect her to ignore the information the Defendant had shared about J.J. Wendy and her husband allowed Brian to talk to the Defendant in private, but they could "hear crying, yelling, stuff like that." When Wendy and her husband saw them again, the Defendant and Brian asked the Mallards to "let them settle this, go home, work on their marriage, forget it ever happened." When Wendy asserted that J.J.'s parents needed to know what happened, the Defendant said, "Wendy I can't. I'll go to prison." Wendy replied that she was sorry but J.J.'s parents needed to know, and she suggested that the Defendant go to the church and allow their pastor to bring J.J.'s parents in to act as a mediator. Wendy said the Defendant and her husband eventually left her home, and she had not seen them since then.

Wendy said that the Defendant never told her who was the aggressor or initiator of the affair with J.J. Instead, the Defendant told her that "it began with the kissing incident and [the Defendant] telling [J.J.] that she wanted him to [kiss her], . . . and . . . went from there." Wendy said the Defendant never indicated that J.J. forced her to have sex with him.

Dawn Lesueur testified that she had known the Defendant and the Defendant's family for eleven years, that they attended the same church, and that she considered the Defendant to be a "really good" friend. Dawn acknowledged that the Defendant talked about J.J., her daughter's boyfriend, "a lot." She stated that J.J. spent "quite a bit" of time with the Defendant and that the Defendant had "mentioned several times that [J.J.] thought of her as a mother" and that J.J. "wished . . . he had a mother like her." Dawn stated that, prior to November 2017, the Defendant "said that Brian[, the Defendant's husband,] "was jealous of [J.J.] and [J.J.] being around." The Defendant disclosed that Brian "had seen some texts . . . he may not have approved of" that were causing "problems with their marriage." When the Defendant made these statements, Dawn did not know the Defendant was having a sexual relationship with J.J.

Dawn stated that the Defendant "was one of the leaders in the youth and helped in the youth group" at Metro Baptist Church, that the Defendant "went on the youth trips" with the church, and that the Defendant stayed with the youth "every Wednesday night when she could." She explained that youth leaders at the church would "oversee the kids[,]" to ensure that no one got hurt, provide "spiritual leadership" and "guidance," and would be someone the kids could "talk to[.]" She said the youth leaders were "there as an adult, . . . just a teacher, leader."

Dawn explained that after having the conference call with her husband, Eric Lesueur, and the Mallards regarding the Defendant's conduct with J.J., they all decided to purchase Brian Tice a plane ticket to North Carolina, so that he would know what was happening and so that J.J.'s parents could be informed. She said that after the Defendant and her husband returned home from North Carolina, she did not see them again. Dawn explained that her husband Eric eventually contacted a man he trusted from church, who then informed church leadership about the relationship between the Defendant and J.J. When she was asked why her family and the Mallards did not immediately contact the police, Dawn said they wanted the Defendant's family to go to J.J.'s family directly and "not have to bring the police or the church" into it; however, she acknowledged, "[W]e just didn't know what we were dealing with." She said her husband finally disclosed the Defendant's inappropriate conduct because it appeared that the Defendant and the Defendant's husband were not going to tell J.J.'s parents.

Eric Lesueur testified that he had known the Defendant and her family for six or seven years. After learning that the Defendant was having sexual relations with J.J., a minor, he purchased a plane ticket for Brian Tice, the Defendant's husband, and then woke him up very early that morning to drive him to the airport. Mr. Lesueur described the conversation that he and Brian Tice had on the way to the airport:

I didn't really want to tell him what was going on. I wanted [the Defendant] to be the one to deal with it. But [Brian] kept asking me on the way to the airport what this was all about and, you know, I just kept assuring him [the Defendant] was safe, he just needed to get there. And he kept asking, and he finally had asked me was [his wife] having an affair, and I told him that she was or it was thought that she was."

Eric explained his interaction with Brian Tice later that afternoon:

[Brian] had called me later that day. Seems like it was that Saturday afternoon. He was there [in North Carolina], and he had asked me not to say anything to anybody, they were working it out, that—you know, [J.J.] was going to be out of their life and this, that, and the other, and just give them some time. I said okay, but I told him when I put him on the plane and at that time that he needed to take this to the church immediately.

Eric said that when Brian Tice and the Defendant never disclosed the Defendant's improper relationship with J.J. to the church, he contacted a church member, Mike England, who was a retired law enforcement officer because he knew England "would be familiar with the law and how to act appropriately." Thereafter, England contacted the church and reported the issue with the Defendant and J.J. Eric said that prior to this

incident being reported, the Defendant "volunteered a lot" at the church and was involved in "activities, trips, functions, probably even substituted at the school at times or helped out."

Ryan Hill, the assistant pastor at Metro Baptist Church and a teacher at the church's private school, Metro Christian Academy, testified that in November 2016, when he was first hired as the youth pastor, the Defendant was already one of the youth leaders at the church. Hill explained that a youth leader's responsibilities included teaching the kids in Sunday school and giving Bible lessons, helping "with crowd control" on Wednesday evenings, and going on retreats and attending activities to help "watch over the teenagers." He said at church camp, the youth leaders "chaperone[d]" the kids, with the "female chaperones" supervising the "teenage girls on their trip" and the "male[ chaperones]" supervising "the teenage boys on the trip." Hill said that the Defendant was one of three chaperones at church camp that took place from June 26, 2017, through June 30, 2017, and that J.J. also attended this church camp. On July 7, 2017, Hill confronted the Defendant regarding J.J. and removed her as a youth group leader.

Hill stated that the Defendant was a substitute teacher in the preschool, elementary school, and high school, and she worked in the lunch room at Metro Christian Academy. The Defendant's schedule and time cards from 2017 were admitted into evidence. In addition, J.J.'s transportation logs at the private school from the 2016-2017 and the 2017-2018 school years were admitted. Hill said that the Defendant was added as an authorized person to check out J.J. in 2016, and that the Defendant continued to be an authorized person who could check out J.J. from school in 2017 and 2018. Hill acknowledged that these sign in/sign out sheets showed that the Defendant only checked J.J. out two or three times. However, he said these sheets would not reflect the number of times that the Defendant drove J.J. home from school.

Hill asserted that on November 8, 2017, he contacted the Goodlettsville Police Department after a deacon in the church said he "had been told that one of [the church] members was having a sexual relationship with a teenager." Hill said he spoke to the Defendant briefly on November 8, 2017, when the detectives came to the church to interview J.J. and the Defendant. When the detectives arrived, Hill pulled J.J. out of class, brought him over to the church building, and left him with the detectives. By the time J.J. was finished meeting with the detectives, B.J., J.J.'s uncle, had arrived at the church. After meeting with the detectives, J.J. spoke to Hill with the detectives' permission, and then Hill brought J.J. to where his uncle was in the building, and they returned home. Hill said he saw the Defendant after she talked to the detectives, and the Defendant was in "disbelief" and was "upset." Hill stated that after that day, the Defendant no longer worked at the church or the church's school.

On cross-examination, Hill said that based on the school's records, the Defendant worked as a substitute teacher in one of J.J.'s classes in March of 2017. He said he thought the Defendant might have been a substitute teacher in "more [of J.J.'s classes]" but he could not say "a hundred percent." Hill said that the school records showed that on August 16, 2016, the Defendant checked J.J. out from school, and on February 2017, the Defendant checked J.J. out of school to go to a singing competition. Hill acknowledged that J.J. had withdrawn from the church's school during the period from August 2016 through November 2016. Hill agreed that on the transportation sheet, the Defendant was listed as someone who could check J.J. out of school "only with permission."

Kristina Evans testified that she lived across the street from J.J. and his family and that her teenage son was good friends with J.J. They invited J.J. to attend the youth group at Metro Baptist Church, and J.J. continued to regularly attend this youth group. Evans worked in the kitchen at Metro Christian Academy, the private school associated with Metro Baptist Church, and she knew the Defendant, who was a member of the church. She said that she considered the Defendant a friend and acknowledged that the Defendant had allowed her and her son to live at the Defendant's home with the Defendant's family for a period of time. She said she never saw any inappropriate activity between the Defendant and J.J.

On cross-examination, Evans stated that she never saw J.J. make any advances toward the Defendant. She denied seeing J.J. pop the Defendant's bra strap. She also said she never heard J.J. make any inappropriate comments toward the Defendant.

Deana Campbell testified that she attended Metro Baptist Church with the Defendant. Campbell said that she had held a leadership position at the church as a youth leader and Sunday school teacher for the last six or seven years. She explained that as a youth leader, she supervised the children. Campbell said that all the youth leaders were responsible for ensuring that the kids were "paying attention and not getting out of control[,]" making sure the kids were "staying in the gym, doing what they're supposed to be doing," making sure the kids on Sundays were going "from one building over to the next for [the church] service." She said that at church camp, the youth leaders were responsible for making "sure the kids [we]re doing what they're supposed to be [doing]" and "not getting out of line." Campbell stated that she was a youth leader when the Defendant was also a youth leader at church.

Campbell said she had known the Defendant and the Defendant's family for eight or nine years. She stated that she and the Defendant routinely attended church camp together, watched over the kids on Wednesday nights, and had some of the same friends.

Campbell affirmed that J.J. attended church and the youth group when she was a youth leader at Metro Baptist Church, which was from late 2016 through November 2017. She noted that at church, the Defendant "definitely would hang around with her daughter and [J.J.] a lot." Campbell recalled "a couple of odd interactions" that occurred at church camp. First, she said the Defendant had rented a golf cart at camp because of her health issues, and the Defendant made her son, who had a hurt back, get off the golf cart, so that J.J. could ride with her on the golf cart. Second, Campbell noted an occasion when she and the Defendant had gone to the gas station "while the kids were doing . . . the camp organized activities[,]" and the Defendant "was very adamant when she bought a Monster Energy drink that we not tell [J.J.], that [J.J.] was worried . . . that something would happen to her because of [her] heart condition," which Campbell thought was "odd."

Campbell said that after the allegations regarding the Defendant came to light, she saw the Defendant in the bathroom at one of her son's basketball games. The Defendant told Campbell that it seemed like she was "mad at her," and Campbell replied, "[Y]ou know, these parents dropped their kids off to us week after week [at church] and they trusted us, and you betrayed that trust." The Defendant told Campbell not to believe everything she heard and then complained that "people were treating her badly." Campbell responded, "[E]ven if . . . the smallest thing happened, the thing is, . . . we are adults and it's our responsibility to say no." Campbell said that, prior to these allegations, the Defendant was generally very well thought of in the church.

J.J., the minor victim, testified that he was seventeen years old and in eleventh grade at the time of trial. He said he had lived with his aunt and uncle, K.J. and B.J., since he was two years old. J.J. said that in the summer of 2016, right after he finished eighth grade, he was invited to attend Metro Baptist Church. J.J. stated that he began to regularly attend Metro Baptist Church and participated in many of the youth group activities there. During the summer before he started ninth grade, J.J. started dating the Defendant's daughter. In the fall of 2016, J.J. started school at Davidson Academy but quickly transferred to Metro Christian Academy because that was where the Defendant's daughter went to school.

J.J. said that at some point during the fall semester, he "got removed" from Metro Christian Academy and was "[h]omeschooled" at B.J.'s and K.J.'s office in downtown Nashville. He said that Evans's son also withdrew from the church's school at the same time and was homeschooled with him. J.J. said that his aunt would take him to the office for homeschooling in the mornings and that most of the time the Defendant would pick up him and Evans's son from the office and bring them back home in the afternoons, although sometimes it was just the Defendant and J.J. on the rides home in the afternoons. J.J. said that during these car rides home, he "began to see [the Defendant] as a mother and got really close to her." He stated, "I would talk to her about things that ha[d] happened in my life, like me coming to live with my aunt and uncle, why I came and lived there, my mom

and dad, my mother not being around, . . . just the struggles of me growing up and kind of the battles that I had to fight." He added, "So [the Defendant] became basically—I would sometimes—I'd even call her my mom—just a mother to me." He said that during this period of time, he was dating the Defendant's daughter. J.J. stated that he was "in love with" the Defendant's daughter, who was his "everything." He said that when he first started going to Metro Baptist Church, the youth leaders who supervised the teenagers were Deana Campbell, the Defendant, and a guy named "Ryan," who was also a pastor.

J.J. said that his relationship with the Defendant changed when he spent the night with the Defendant's son at the Defendant's home. He said that Evans's son spent the night as well, and the three of them played video games in the living room. He said that earlier that day he had talked to the Defendant about his "past" and his "life" and "was just getting really close with her." He said the Defendant had "massaged [his] back[,]" had "made [him] feel . . . at home" and "just comfortable[,]" and had brought him "food." J.J. said, "[L]ater that night after everyone was asleep [the Defendant] came down and we got close and she started making out with me[.]" He explained that the Defendant "kissed" him and "grab[bed] his crotch" as he was lying on the floor in the living room because that was where the boys were sleeping. J.J. said, "[T]hen we went to the kitchen and that was . . . when [the Defendant] performed oral sex on me, and that's the first time things happened." He said the next time he had sexual contact with the Defendant was "probably at her house" because "it happened a lot."

J.J. said that the first time he had sexual intercourse with the Defendant was at the Defendant's house "on a weekend" when the rest of her family was somewhere else. He noted that Evans's son was also there, although he was "oblivious to the whole thing" because he "had his headset on" and was "playing [video]games" all the time. J.J. said that the Defendant brought him to her bedroom and "started stripping down" and they "had sex in her bed." He said that they used contraception during that incident.

When asked about the next time he had sexual relations with the Defendant, J.J. said he did not remember specifically "because it happened so often." He said, "[The Defendant] would take me in her van a lot of times" and "would tell her husband that she was going somewhere where she wasn't actually going" and "would go drop off her kids at her dad's house." J.J. said the Defendant drove down "this dead-end road" and "stopped" and J.J. "got in the back of the van" and they "had sex again." When they were done, the Defendant tried to start her van but it would not start. J.J. said that the Defendant "couldn't call her husband because she didn't want her husband to know we were down this road alone" and that he "didn't want to call anyone." J.J. said the Defendant "went door-to-door knocking for people to come help her . . . get her car started." A man answered his door and brought jumper cables, and the Defendant told this man that J.J. was her son and that they were "looking at the house that was for sale that was at the end of this dead-end road."

J.J. said "it would happen a lot at" this "road" that was "right behind [the Defendant's] house." Thereafter, the State and J.J. had the following exchange:

State:          And you talked about this road that was behind [the Defendant's] house. What happened at the road behind her house?

J.J.:           I mean, she brought me there to have sex multiple times.

State:          When you said "have sex," different kinds of sex?

J.J.:           Oral—all of—everything. Oral sex, everything.

State:          Did you have intercourse during those periods of times?

J.J.:           Yes, sir.

J.J. said that on a different occasion, he and the Defendant went to a hotel in Rivergate behind the Hooters where they had sexual relations. He said that when this incident occurred, he was still dating the Defendant's daughter.

J.J. said that during a different incident, he and the Defendant engaged in bondage. He said that the Defendant had brought him and her son to the airsoft course. He said, "[S]he kept bugging me and bugging me to go out to the car with her, and I did what she wanted me to do[,] and I went out to the car." J.J. said that the Defendant "brought rope from her house" and she asked him to tie her up so he "did it."

When asked when was the last time he had sexual relations with the Defendant, J.J. said he did not know "the exact date" but it was "right around when all this came out" in the fall of 2017. He said that this incident occurred at the Defendant's house in her bedroom. She said that the Defendant "would call [his] aunt a lot and . . . text [his] aunt just these long paragraphs about . . . how she was going to get me over to her house, and she did that [on this occasion]." He remembered that the Defendant called him on his phone while he was mowing the grass and told him that he was coming over because she had just talked to his aunt and uncle about it, and he said, "okay, whatever." When he got to the Defendant's home, the rest of her family was at a football game. J.J. said that whenever he saw the Defendant, she would make sure her daughter was either at work or at a friend's house. He said the Defendant would "push [her daughter] out of the house, basically, when I would come over."

When J.J. was questioned about whether he always used contraceptives when he had sex with the Defendant, J.J. said, "I tried to use a condom[,] and she would not let me." He said there was a period of time in which the Defendant told him that she was pregnant with his child. He said he started "freaking out" and "yelling at her" and told her that this was her fault "because a lot of [the] time she would just put the blame on me." He said he "couldn't think straight" when she said she was pregnant and that when he "went to school[,]" he "couldn't do anything[,]" and "[i]t was just really scary." He said the Defendant talked to him about baby names and told him she wanted to marry him. J.J. said, "One night she said she wanted to be with me when I was 18 years old, and I told her she was crazy."

J.J. stated that on the afternoon of November 8, 2017, Ryan Hill came into his classroom and asked him to come with him. They went over to the church building and the detectives began questioning him about whether things were happening with the Defendant, and he "told them no." J.J. said, "I was scared, so I lied. I didn't know what to do. I just really—I just felt guilty and ashamed and broken." He said that when he talked to the detectives later on, he "finally broke down and told them what was really happening." J.J. said that after he spoke to the detectives and was heading home, the Defendant began texting him, "telling him to delete everything on [his] phone between [them], pictures, anything that she had sent me" and J.J. "did what she told [him] once again[.]"

J.J. said that at some point after November 8, 2017, the Defendant's daughter brought her cell phone to him, told him that it was her mother, and instructed him to go to the gym bathroom to talk to her. He said he complied, and the Defendant and her husband were on the phone, and they asked him what he told the detectives, and J.J. said he did not tell the detectives anything because "it was finally [his] time to where [he] didn't really have to . . . have her in [his] life anymore."

J.J. stated that he left Metro Christian Academy and went to a "therapeutic boarding school" in Missouri in early February 2018 to work "on a lot of things" that had happened. He said that from November 8, 2017, to early February 2018, he continued to communicate with the Defendant's daughter. However, when he returned home from his boarding school, he called her and "told her [he] was done" and "couldn't do it anymore." He said that call was the last time he spoke to her.

J.J. recalled a time, when he was first dating the Defendant's daughter, that Kristina Evans was driving them, the Defendant was in the passenger seat, and J.J. and the Defendant's daughter were in the backseat of the car. He said the Defendant asked him to give her a kiss in front of her daughter. The Defendant said, "[O]h, just a pop kiss. I'm like your mom." He said "[the Defendant] made it seem like it was going to be okay. And

it was weird, but I did it, and [the Defendant's daughter] looked at me like I was crazy and then was just arguing with her mom in the backseat, and then I kind of just looked out of the window not really sure what was going on." J.J. said, "I think that situation is kind of how it like kicked off, how things started physically." J.J. said he later apologized to the Defendant and she told him "not to apologize . . . like there was nothing wrong with what happened."

On cross-examination, when asked if he ever said anything to the Defendant's daughter like her mother was hot, J.J. said, "I don't think so." When defense counsel asked him if the Defendant's daughter would be lying if she said that, the Defendant replied, "Probably. I don't think [the Defendant's daughter] would lie to me." J.J. then acknowledged that he knew a girl named Mackenzie and a girl named Alana. The State asked to approach the bench, and the trial court ultimately asked that the jury exit the courtroom.[4] When the jury returned, the trial court told the jury that the State had "objected to a line of questioning" and after conducting a hearing out of the jury's presence, the trial court sustained the State's objection.

J.J. agreed that when he was initially interviewed by the detectives, he told them that nothing was going on between the Defendant and him. He said that the detectives told him the Defendant admitted to having a sexual relationship with him, and he told the detectives that they were lying. J.J. asserted that it was the Defendant's idea to tie her up in the van, but he denied that the Defendant got upset and cried afterward. J.J. acknowledged that there were other times that the Defendant cried after they had sexual relations.

J.J. stated that he was going to a boarding school in Missouri that was trauma-based. He acknowledged that there were other things in his life from the time that he was very young that caused him trauma.

B.J. testified that he was J.J.'s uncle and had been his guardian since J.J. was two-and-a-half years old. B.J. said sometime after J.J. began attending school at Metro Christian Academy in 2016, he and his wife, K.J., began attending Metro Baptist Church. They became aware that J.J. was dating the Defendant's daughter, who also attended that church. He noted that the Defendant and her family were the first people to introduce themselves to them at a church function. He was aware that the relationship between J.J. and the Defendant's daughter continued for a while and that the Defendant's daughter would sometimes come over to their home.

---

[4] The contents of this jury-out hearing are detailed in Section IV of this opinion.

B.J. said that he and K.J. decided to add the Defendant to their transportation list at school because she often brought J.J. home in the afternoons and frequently drove him to choral performances.

On November 8, 2017, B.J. was driving into Nashville from Chattanooga when Ryan Hill, the associate pastor at the church, called him and said that he needed him to come to the church immediately because there had been an issue. When B.J. asked what had happened, Hill said he could not tell him that he would need to speak to the detectives. Upon arriving at the church, B.J. was introduced to Detective Mills, who asked him if he knew the Defendant, and B.J. said he did. Detective Mills then asked if he knew that there had been a sexual relationship between J.J. and the Defendant, and B.J. replied, "Absolutely not." B.J. said J.J. later gave him information that made him believe that J.J. and the Defendant were involved. As a result, B.J. called the Defendant while the detectives were present. The recording of B.J.'s phone call with the Defendant was played for the jury. B.J. remained at church after this phone call and later saw the Defendant at church, although he did not talk to her.

B.J. said that later that night, the Defendant and her husband, Brian Tice, came to his and K.J.'s home. He said that during the ensuing conversation, the Defendant admitted that she and J.J. "had an affair." As a result of the allegations against the Defendant, B.J. said that he and his wife decided to take J.J. out of Metro Christian Academy and send him to a boarding school in Missouri.

On cross-examination, B.J. acknowledged that J.J. had endured some trauma when he was very young. He admitted that J.J. had been exposed to things that no little child should be exposed to. Defense counsel said, "And part of that is a result of both his parents were sex addicts?" The State objected on the basis that there had been no testimony regarding that issue at any point in time during this trial, and the trial court sustained the objection. Defense counsel approached the bench and asked to make an offer of proof, and the trial court requested that the jury leave the courtroom.[5] When the jury returned, the trial court stated that it had sustained "the objection regarding [J.J.] being exposed to sex addicts as parents" and that it was "striking that from the record." The court instructed the jury "not to . . . consider anything about that particular statement."

When cross-examination resumed, B.J. said that J.J. was in a bad situation and came to live with him and his wife when J.J. was a small child and that J.J. had been with them ever since. B.J. said that before these allegations came to light, his family was close to the

---

[5] The substance of this jury-out hearing and the defense's offer of proof are found in section V of this opinion.

Defendant and her family. He also said that prior to these allegations, the Defendant was a well-respected person at church.

K.J. testified that she and B.J. became J.J.'s legal guardian when J.J.'s father and girlfriend at the time were having substance abuse issues. She said the court asked them to take custody of J.J. because it could not allow J.J. to live with either of his biological parents.

K.J. stated that during the summer of 2016, which was before J.J.'s ninth-grade year, J.J. began attending Metro Baptist Church. K.J. said that she and B.J. first went to that church for a potluck in September or October 2016, when J.J. was in ninth grade, and they met the Defendant and the Defendant's family. K.J. said the Defendant was a "longstanding member of the church" who was a substitute teacher at the church's school and was involved in the church's youth group. She said the Defendant "would chaperone field trips" and was involved in the youth group activities on Wednesday nights.

K.J. affirmed that when J.J. and Evans's son were being homeschooled at their office downtown, the Defendant would sometimes pick up the boys and take them home. She said that during this homeschooling period, J.J. would see the Defendant and her family at church on Sundays and "would go home with them after . . . church" and if the Defendant's family did any activities, they would always invite J.J. along.

K.J. stated that in January 2017, which was still J.J.'s freshman year, J.J. was allowed to return to Metro Christian Academy. She said that J.J. and Evans's son apologized to the church staff and asked for forgiveness for posting a video of themselves smoking marijuana on social media, which was why the school initially required them to withdraw.

K.J. said that when J.J. turned fifteen years old in January of 2017, the Defendant threw him a birthday party. She said that because the Defendant was the mother of J.J.'s girlfriend, she and B.J. trusted the Defendant with J.J. K.J. said that her concern when J.J. was over at the Defendant's home was that she did not want the Defendant's daughter, J.J.'s girlfriend, to be around, and K.J. never thought she needed to be concerned about J.J. being around the Defendant. She said the Defendant "always assured [her] that [the Defendant's daughter] was over at a friend's house and that the reason she was inviting [J.J.] to spend the night was that her son, [], [Evans's son] and [J.J.] were all going to stay there and play video games all night." K.J. also said that she trusted the Defendant because she was a youth leader at church and had supervised youth trips with the church. K.J. said that the Defendant "always volunteered" to take J.J. with her on the church youth trips, and she said she "felt very comfortable with her doing so because [the Defendant and her family] were so involved with the church and the school[.]"

K.J. asserted that she added the Defendant to the pick up list from school in February 2017, which allowed the Defendant to sign J.J. out of school early. She also listed the Defendant as an authorized person to pick up J.J. from school on May 17, 2017, which established the transportation list for the 2017-2018 school year. K.J. stated that from January 2017 until May or June 2017, J.J. was with the Defendant and her family at least two days after school each week and on Sundays at least twice a month, if not more. She noted that the Defendant always called her to make arrangements for J.J. to spend time with her family and that J.J. never made such requests. The Defendant would often call to say that she was helping Kristina Evans with carpool because Kristina was working, and the Defendant would frequently bring J.J. back from church on Wednesday nights. The Defendant also invited J.J. to go home with them after church and then drove J.J. back and forth to church on Sunday nights. K.J. said that J.J. spent the night at the Defendant's home twice a month and that the Defendant made the arrangements for him to do this. Often, the Defendant would bring J.J. home from school without Evans's son.

K.J. said that one of J.J.'s chores was to clean the horse's stalls, and the Defendant would even help him with this. She noted that often the Defendant would want J.J. to do something, and when K.J. told her that J.J. needed to do his chores first, the Defendant would say that she and her kids would go over to Kristina Evans's home, which was right across the street, until J.J. finished with his chores. K.J. said that when she insisted that J.J. needed to get his chores done and that they would call her later, the Defendant "would say, no, we'll just wait." K.J. stated that sometimes the Defendant would say, "[W]hy don't I just come over and help him and he can finish quicker," and then the Defendant would "help him muck out" fifteen horse stalls, which was "a lot of work." Sometimes the Defendant's children would be with her when she did this but sometimes she would be alone with J.J.

Prior to the summer of 2017, K.J. told the Defendant that she and B.J. thought J.J. was spending too much time over at the Defendant's home, and the Defendant "said that her husband, Brian, had said the same thing to her before, that [he] felt that . . . she was too involved in the teenagers and what was going on with the teenagers in that group, and it wasn't the first time she heard it, and she understood and she would back off." K.J. said that the Defendant did back off for "a week or so[,]" and J.J. would go to the Defendant's home one day a week rather than two or three days a week, and the Defendant would not ask for him to come over as much, "but then it would start back up." During this time period, K.J. had no idea that there was a sexual relationship going on between the Defendant and J.J., so she continued to allow J.J. to spend some time with the Defendant's family. K.J. noted that during the summer of 2017, after J.J.'s ninth grade year, the Defendant was a chaperone on a church retreat that J.J. attended.

K.J. said that in late October 2017, during J.J.'s tenth grade year and a few weeks before the allegations came to light, K.J. saw a text message or Instagram message on J.J.'s phone and confronted the Defendant about it. The Defendant acknowledged that she had sent the text, which "basically said that I love you and I can take you to places no [one] else could take you to and you need to allow me to do this for you, but your behavior is causing me not to want to be around you." K.J. said that this text "sounded [like] a boyfriend-girlfriend relationship and [was] totally inappropriate." At that point, J.J. had the Defendant stored in his phone as "Mother." When K.J. asked J.J. about this text message, J.J. said that the Defendant was "crazy" and that she needed to call her and ask her because he could not explain why she sent it. When K.J. confronted the Defendant about this text message, the Defendant claimed "she was trying to enrich [J.J.]'s life in the Lord and she was trying to take him to higher places in God and find himself spiritually and become a more spiritual person[.]" The Defendant asserted that K.J. had "misinterpreted" the text, and the Defendant denied that there was anything inappropriate going on between her and J.J.

On November 8, 2017, K.J. received a phone call from B.J. asking her to come to Metro Baptist Church. She also was present during a controlled call that B.J. made to the Defendant. K.J. said that she got on this call at the end of it and spoke to the Defendant.

K.J. said that the evening of November 8, 2017, the Defendant and her husband came over to their home. K.J. wore a wire and recorded their conversation, which was played for the jury. During this recording, the Defendant asserted that the sexual relationship she had with J.J. was "consensual" and that J.J. "never manipulated" or "coerced" her "to do anything." The Defendant also said the relationship with J.J. began with "flirting" and "little glances and touches."

On cross-examination, K.J. acknowledged that the Defendant was listed on the sign out sheet at school as being authorized to pick up J.J. early with permission, which meant that the Defendant had to call K.J. each time she would pick up J.J. She agreed that often the Defendant was picking up J.J. along with her own children and Evans's son at the same time. However, she asserted that when the Defendant brought J.J. home from school, the Defendant did not have to get permission from her before doing this. K.J. conceded that J.J. sometimes had a problem with lying.

Detective Elizabeth Mills of the Metropolitan Nashville Police Department testified that she was assigned to investigate allegations of possible crimes committed by the Defendant. She said that the Goodlettsville Police Department was originally notified by Metro Baptist Church about an adult having sex with a juvenile and once they determined that the church was in Davidson County, then Detective Mill's sergeant assigned her the case.

- 16 -

Detective Mills said that on November 8, 2017, she went to the Metro Baptist Church after she talked to Ryan Hill about the information he had. Upon arriving at the church, Detective Mills interviewed J.J., who initially denied a sexual relationship with the Defendant and said he did not feel comfortable talking any further without his guardians, K.J. and B.J. Detective Mills acknowledged that J.J. initially told her she was lying about the allegations against the Defendant. However, when Detective Mills talked to J.J. later, J.J. changed his story, which led her to interview the Defendant. Prior to interviewing the Defendant, Detective Mills spoke to B.J., and she placed a recording device on his cell phone and had B.J. call the Defendant. When Detective Mills interviewed the Defendant, the Defendant stated that she and J.J. were "very close" but the Defendant denied several times that she had a sexual relationship with J.J.

At the end of this interview, Detective Mills and Detective Hoffman went back to their office, and Detective Mills believed that the Defendant might try to contact J.J. and his family, so she went to K.J. and B.J.'s home. When she arrived there, Detective Mills realized that the Defendant was already at their home, so she provided a recording device for K.J. Detective Mills left their home, and K.J. subsequently recorded a conversation between her, B.J., and the Defendant.

Detective Mills said that as a result of her interview with J.J. at the church, she obtained information indicating that sexual conduct between the Defendant and J.J. had taken place in Davidson County and in Sumner County. Consequently, Detective Mills coordinated with Detective Hampton in Sumner County regarding the rest of this case. She gave Detective Hampton the information she gathered as a part of her investigation, as well as the controlled call and the recorded conversation that took place at K.J. and B.J.'s home. Detective Mills stated that during her investigation, she also talked to Wendy Mallard, who provided some information that was vital to her investigation of this case.

On cross-examination, Detective Mills stated that, as a part of her investigation, she discovered that the Defendant's sexual relationship with J.J. started in December 2016, when J.J. was just fourteen years old. She said that J.J. turned fifteen years old in January 2017, and that the sexual relationship continued until October of 2017. Detective Mills acknowledged that in the initial interview, J.J. was pretty adamant in his denials regarding a sexual relationship with the Defendant. She acknowledged that J.J. accused her of lying when she told J.J. that the Defendant had admitted to an inappropriate relationship with him.

The Defendant's daughter testified that she first met J.J. when he began attending Metro Christian Academy in late August 2016 and began attending her church. She said that she and J.J. dated for a year and a half. She stated that the Defendant had permission

from J.J.'s parents to drive J.J. home after school and that most of the time, she was also in the car with them on the way home.

The Defendant's daughter recalled an incident when J.J. and the Defendant kissed in the car after they all went to a movie. She said that she, Kristina Evans, and Kristina's son were also in the car when this incident occurred. The Defendant's daughter said that they "were just messing around, like joking" when it happened.

The Defendant's daughter said that she noticed that J.J. "would be really rough with [the Defendant], like he would kind of just wrestle with her and kind of push her around." She added that J.J. "would pinch [the Defendant] on her arm or on her boob" and that "sometimes he would go up and hug her." The Defendant's daughter said that whenever J.J. would do these things, the Defendant "would push him away." She stated that J.J. often flattered the Defendant. On cross-examination, the State asked the Defendant's daughter if she thought a lot of J.J., and she said, "I guess so." She said that she thought "[a] lot more" of her mother, the Defendant.

The Defendant testified on her own behalf. She stated that she had attended Metro Baptist Church almost her entire life. She "volunteer[ed] in the [church's] youth group" after her oldest son joined that group, and she taught Sunday school and had been volunteering in the church nursery since she was a teenager. She also volunteered during the church's special events and fundraisers and would help raise money for mission trips or for the kids to go to camp. The Defendant said she had been involved in her church and in other charitable work for years, including helping single moms get into homes. She noted that she helped Kristina Evans find her apartment, furnish her entire apartment, and buy food from local donations around the area. The Defendant noted that Kristina Evans and her son had lived with the Defendant's family for a few months after Kristina's mother and step-father asked her to leave their home.

The Defendant stated that the first time she was aware of J.J. being at her church was at the youth pastor's goodbye party that took place in August 2016, right before school started. She said that although J.J. was at that party, she did not meet him that night. She noted that J.J. started school at Metro Christian Academy the following Monday and that J.J. and the Defendant's daughter first met at school, rather than at church. The Defendant said that on the Wednesday after school started, the youth pastor pointed J.J. out to her and said that J.J. liked the Defendant's daughter and that J.J. had been there for two days or so. The Defendant said that she did not officially meet J.J. until "the end of August, beginning of September" when the Defendant's daughter introduced J.J. to her at church. She said that at that point, J.J. had been attending Metro Christian Academy "for a few weeks."

The Defendant said that during the second week of September, she was volunteering at the school for grandparent's day, and J.J. "got kicked out [of school] that day." She said that J.J. did not return to Metro Christian Academy until January 2017. When asked about what interaction she had with J.J. from September 2016 through the fall, the Defendant replied, "Right at first we really didn't have much interaction at all," although she admitted that the following Sunday she and the Defendant's family first met K.J. and B.J., as well as Kristina Evans, during a homecoming dinner at church. She said her daughter had encouraged her to be friends with Kristina Evans, who was a single mother. She introduced herself to Kristina and K.J. and B.J., and mentioned that J.J. and her daughter liked each other, but she did not bring up J.J. being kicked out of the school because she did not want to make them feel uncomfortable. After that, the Defendant said she "didn't really see [J.J.] much except maybe here and there when he came to church." She encouraged both J.J. and Evans's son, who had been kicked out of school, to keep coming to church. At the end of September 2016, her daughter continued to talk to her about J.J., and the Defendant told her husband that they needed to get to know K.J., B.J., and J.J. because their daughter seemed to "actually have feelings for [J.J.]" She said at that point, they did not know K.J. and B.J. well, and she had only met J.J. once or twice at church.

The next Sunday, the Defendant invited J.J.'s family and Kristina Evans and her son to lunch, and although K.J. and B.J. were not able to come, they allowed J.J. to go. The Defendant said that "in the beginning [J.J.] didn't come over to the house right away." They saw him at church and J.J. may have come to the Defendant's home a couple of weeks later. She acknowledged that over the next couple of months, J.J. did come to her home some on Saturday and Sunday afternoons. At that point, J.J. was not attending Metro Christian Academy, and he and her daughter "didn't really see each other that much" so he would come to her home. She said that J.J. attended her son's football game and that J.J. went to the movies with them one time.

The Defendant said that at the end of October or beginning of November 2016, right before J.J. went on a trip to Montana, J.J. called her and asked if the Defendant would be willing to talk to him about something going on with Kristina Evans and her son, who was his friend. The Defendant agreed to talk to him, and J.J. got her phone number and "call[ed] and text[ed] [her] from time to time." When J.J. went on the trip to Montana, J.J. was "texting constantly" about all the activities they were doing in Montana to the Defendant's daughter and the Defendant in a "group message." She said that at some point in November 2016, J.J. came to her home, looked at the Defendant's yearbook, and then sent a group text to her and the Defendant's daughter "about how hot [the Defendant] was as a teenager[.]"

In December 2016, the Defendant said J.J. was still not back at school. She asserted that she did not start picking up J.J. from K.J. and B.J.'s office until the last two weeks of

homeschool. She said originally K.J. was taking J.J. and Evans's son to her office in the mornings, and Kristina was picking them up in the afternoon. However, when Kristina's work schedule changed, she asked the Defendant to pick up the boys and bring them home. She said that she only picked them up the last weeks of homeschool, and then only three days a week. She said "three of the times [J.J.] wasn't even there" because he had to get a haircut or had a counseling appointment, "[s]o the other three times it was actually just [Evans's son] that [she] ended up picking up and dropping him off."

The Defendant said that the very first thing that happened between her and J.J. was after she, Kristina Evans and her son, and the Defendant's daughter, and J.J. went to a movie. At that time, J.J. and the Defendant's daughter had already kissed, but they were joking on the car ride home about wanting to kiss. Then the Defendant said, "[O]h boy, well you know, [the Defendant's daughter's] daddy doesn't want her dating and doesn't want her kissing anybody." The Defendant then told J.J., "If you, you know, want to kiss her, you're going to have to kiss her daddy, . . . you're going to have to kiss [Evans's son] or you're going to have to kiss Kristina, or you're going to have to kiss me, and it was very much a joke and everyone was laughing." The Defendant added, "I just had my head turned around as I was saying it and [J.J.] just real funny, just real fast leaned up and just pop-kissed me, and I was like, oh." She said everybody was "kind of like, oh my gosh, and then they all just started laughing." She said J.J. later admitted that he probably should not have done that, and she told him, "[W]ell, I mean, I guess, you know, it's okay." The Defendant said that she was not "upset or anything," although she did not expect J.J. to kiss her.

The Defendant said that the second incident was when J.J. spent the night at her house while Kristina and her son were there but the rest of her family was in New York. She stated that she and Kristina were drinking alcohol, even though she hardly ever drank, and that she "felt like [she] was drunk." She said that Kristina went to bed because she had to work the next day, and the boys were downstairs playing video games. The Defendant went upstairs, got in her bed, and went to sleep. The Defendant described what happened next:

> I wake up to [J.J.] in my bed and he's kissing me and trying to take my clothes off[,] and I said—I just said, what are you doing? Stop now. I don't know why you're doing this. What are you doing? He said, Jamie, I love you. I think you're so hot. And he just continued to kiss me and he took my clothes off as I'm telling him, no, stop. I don't want you to do that.

> And, I, again, was very drunk, and I am trying to push him away, but [J.J.]—I know he came in here as a 17-year-old kid today and that was two years ago, but he was still 5-10, 175 pounds. So he's a pretty heavy guy and

- 20 -

he was on top of me and—and he just continued to kiss me and he just continued to take off my clothes, and I said no.

I did not get up and scream and yell and run out of the door. I didn't do that, I did tell him no many, many times and he—I had my legs closed and he put his legs between my legs and spread them open, and then he got on top of me and he—as I'm telling him no, I don't want to, he just continues to and he—he—and he did.

. . . .

He did—he did put his—he did put his penis in my vagina.

The Defendant said that after that, J.J. left the room, and she "laid there" and "just cried." She said that up until that point, she "loved [J.J.] and he did seem like a son to me."

The Defendant said that the next morning, while she was driving J.J. home, she asked J.J. why he did what he did. She said that it seemed like "a switch flipped inside of him[,]" and J.J. began "cuss[ing]" and told her she "better not tell Brian and [she] better not tell [the Defendant's daughter]." The Defendant told J.J. that she had never seen him act like this, and he said, "[A]ll of that was pretend. I was just . . . acting that way so I could get what I wanted[,] which was to f[—]k you." She said she cried all the way back to J.J.'s home.

The Defendant acknowledged that she had sexual relations with J.J. after that but J.J. "started to use that [first incident] as leverage over [her]." She said that J.J. "would use that [and hold that] over my head for everything, whether it was he wanted to do something with [the Defendant's daughter] or he wanted to come over to the house, or he wanted us to do something sexually[.]"

She said that although she helped to organize J.J.'s birthday party, it was the Defendant's daughter's idea to have the party. J.J. told her to ask K.J. and B.J. if he could spend the night after the party because it was going to be late when it was over. She said that her younger kids had stayed with her parents and the Defendant's daughter had gone to stay with a friend that night. When they got home, J.J. said "he wanted to have sex again," and the Defendant said, "[T]hat happened the one time[,] and I don't want . . . you to ever tell anybody about that. And . . . I won't tell anybody about that[.]" The Defendant said she promised him that she wouldn't say anything, but he wanted to have sex, so they went to "the little side road that he was talking about." The Defendant said that J.J. was "very demanding" and said, "You're going to do what I'm telling you because I'm going to tell on you and they're not going to believe you because you're an adult, and you're the one that's supposed to make the decision."

- 21 -

The Defendant said that although J.J. claimed that they had sexual relations forty to fifty times, they only had sex "more around 20" times. The Defendant said,

> I was caught between the worst rock and a hard place of my entire life, and I didn't know what to say or do, and I should have said something and really I was just afraid. I was afraid of this because he said he would lie—he would lie about everything.

The Defendant said J.J. never threatened to tell the police but he did threaten to tell her daughter, Brian, K.J. and B.J., and Ryan Hill at church. The Defendant said J.J. also threatened to have sex with her daughter. The Defendant asserted, "[W]e would have sex and [J.J.] would say, that doesn't ever need to happen again . . . and I would say, okay, never again. I don't want that to happen again either, and I said, just stop coming to me . . . . Please stop coming to me for sex." The Defendant said that J.J. "would go back and forth between these personalities and these highs and these lows of I love you, I love you, I love you, I hate you, I hate you, I hate you. And it was . . . a daily thing." She said that J.J. coerced her every time he wanted to have sex. She also said that J.J. would "threaten to tell even if it wasn't sexual, if I wouldn't let him and [the Defendant's daughter] do something that he wanted to do, go somewhere, whatever" and he "would also threaten that he would do to [the Defendant's daughter] the same thing and that he would go and do that to her."

The Defendant said J.J. "had a lot of fantasies" and one time he sent her a private message on Instagram that he wanted to tie her up. She claimed that after she dropped off her son to play airsoft, J.J. told her to pull over because he "wanted to have sex[.]" She said there was a yellow nylon braided rope in the back of her van that was a part of an emergency kit, although she did not "know where it came from." She said J.J. pulled her pants down, told her to lie face down on the floor of the van, tied up her hands and her feet with the rope, and told her to be quiet. The Defendant said she begged him not to do this and told him she was uncomfortable, and J.J. told her that she was fine and then held the back of her shoulders and her neck down so that her face hit the bottom of the seats while he was having sex with her. The Defendant said she felt "numb when he got done." She said that after this, J.J. began crying and apologized to her. The Defendant said that J.J. admitted that he could not stop himself and told her it was her responsibility to stop this. Then J.J. "started cussing" her, and the Defendant promised him that they would not ever do that again, but she told him to not come to her for sex anymore. She claimed that she "never, not one time . . . made an advance at [J.J.]" The Defendant said that J.J. did not always see her cry after they had sex, although she cried some because he was "very aggressive with what he did." She also said that sometimes she was "just really numb[.]"

- 22 -

The Defendant said that she visited Wendy Mallard in North Carolina and that the first night she was there, she had "multiple, multiple glasses of wine." She said she did not drink very much "so it got to [her] real fast." She had already told Wendy that there was "something going on" between her and someone else, although she never identified who it was. The Defendant claimed that she initially called Wendy because she "was trying to figure out . . . what [she] needed to do to get away from the situation . . . without telling [Wendy] what had actually happened[.]" When she arrived in North Carolina, Wendy asked her if the person with whom she was having an affair came to her again, and the Defendant confirmed that he had. The Defendant claimed that she told Wendy that this man "wanted to have sex in every room" of the Defendant's home, not that they actually did have sex in every room of her house. She did not remember telling Wendy that she was having an affair, although she did recall telling her that she "had been with someone else[.]" The Defendant admitted that she did not tell Wendy that this person "had been aggressive with [her][,]" but she did tell her that this person "wouldn't stop coming [to her]," which prompted Wendy to ask her who it was.

The Defendant denied feeling "giddy" about her relationship with J.J., although she acknowledged that she had been drinking. She said she told Wendy that J.J. thought she was pregnant, and he was excited about it, even though the Defendant knew it was impossible for her to have another child because of her health issues. The Defendant claimed that J.J. was the one who insisted that she was pregnant with his child and that the baby would be named after him. She also said that J.J. claimed his uncle was going to "give [him] a bunch of money" when he turned eighteen and that he was going to take her "around the world." The Defendant said she told J.J. that she loved him but that was not going to happen because of her family. She said that although she did not love J.J. romantically that J.J. loved her in that way. The Defendant said that when J.J. was "doing things to [her]," he would yell at her, tell her to say that she loved him, and demand her to say, "eff me, daddy; eff me, daddy."

When defense counsel asked her why she did not tell K.J. and B.J. during the controlled phone conversation that J.J. had forced himself on her and had been holding it over her head, the Defendant said she did not want to "hurt" or "say anything about" J.J. and because she "felt like [she] was being recorded." At that time, the Defendant said she was "afraid" because Kristina Evans had already called and told her that "something happened at the school" that day and "the police were already there[.]" As a result, she did not want to say anything during that conversation that "could have implicated" J.J. or her.

When asked why she did not tell K.J. and B.J. at their home that J.J. had taken advantage of her and was coercing her to have sex with him, the Defendant said that her husband tried to tell them that J.J. had manipulated her, but B.J. got "very angry" and "jumped out of the chair" and said that the conversation was over because this did not

"have anything to do with [J.J.]" She also said that she could see J.J. standing on the other side of a closed door to their living room and that if she "said anything[,]" he "would make [her] pay for it in his own way . . . in lies or whatever it was going to be." The Defendant added, "I just protected [J.J.] out of fear and also because I didn't want to hurt [J.J.'s family] any more than they were already hurting[.]" She said that after her husband said that J.J. had been manipulative to her, she "overcorrected" and began saying that J.J. did not do anything wrong because B.J. was upset and J.J. was listening on the other side of the door, and she knew J.J. well enough to know that he was "going to lie about it" and "the truth didn't matter anymore at that point about what actually happened between" the two of them.

On cross-examination, the Defendant acknowledged that she and Wendy Mallard were close friends before she visited her in North Carolina on November 1, 2017, but that Wendy misconstrued everything the Defendant told her on that trip, stating "The discussion happened but not the way [Wendy] stated it." When asked if Wendy Mallard was being dishonest with the court, the Defendant replied, "I do not think she's being dishonest. I just think that she was drinking wine, just like I was, and she doesn't remember the whole conversation correctly." The Defendant denied talking about J.J. during the entire visit to North Carolina. She said that J.J. "repeatedly" used the first incident "to say that you will do this or I'm going to tell on you and what you did."

The Defendant stated that she did not tell Wendy that J.J. was forcing himself on her, even though she was in a place where she was safe from J.J.'s alleged extortion. She said, "I'm telling [Wendy] about the relationship that was happening and I wasn't telling her that it was [J.J.]" Although Wendy testified that the Defendant used the word "affair" to describe what was happening with J.J., the Defendant did not recall using that term. Although the Defendant did not think Wendy was "lying" about her using the word "affair"; instead, she claimed that Wendy was just "remembering whatever she thinks that I said."

Regarding the first instance of sexual intercourse, the Defendant denied making the choice to stay home from her family's trip to New York, so that she could spend time with J.J. When the State asked if she was drinking and playing games with two underage boys, the Defendant replied, "I don't think that there's anything illegal about that." The Defendant admitted that she never said anything about this forced sexual encounter with J.J. to Detective Mills or Detective Hampton. Although the Defendant vehemently denied that J.J. had done anything wrong when she spoke to B.J. and K.J., she said she only did that because J.J. was listening to their conversation on the other side of the door and J.J. "had a control over [her] that [she] can't even begin to explain how that happened." She also said that she "didn't want to hurt [J.J.] and [she] didn't want to hurt [K.J. and B.J.]"

- 24 -

The Defendant acknowledged that she continued to let J.J. date her daughter even after J.J. allegedly forced himself on her in December 2016. In addition, the Defendant admitted that even though J.J. had forced himself on her, she continued to pick up J.J., take him places, and help him clean out barn stalls. She said, "I did not completely let him go away because he would have told . . . that [she] raped him, that [she] forced him."

The Defendant acknowledged that she sent J.J. a text message on January 1, 2017 that said, "I just texted your uncle and asked if you can spend the night." However, she said she was not sure if J.J. actually spent the night at her house.

The Defendant also acknowledged that there was a text message, which stated, "I feel lost without you like a part of me is missing," that she sent to J.J. on January 29, 2017, but that she actually intended for this text message to go to her husband. She said she immediately apologized and said she did not mean to send that to J.J. in another text and then sent the original text to her husband, who was out of town.

The Defendant also acknowledged that on June 1, 2017, J.J. sent her the following text message: "But I still love you and you told me not to push you away so I won't but just know that it does hurt me." The Defendant said she replied to that message with the following text message: "I'm so sorry that you are hurt. That was never my intention. I love you so much, and I can't wait to see your sweet face." She said that she and her husband had been at the beach and had gone on a date and posted a picture of their date on Instagram, and J.J. sent her that text out of anger because he was "very jealous" of her husband.

> The Defendant admitted that on October 1, 2017, she sent J.J. the following text: Do you remember last year at homecoming dinner? That was the first time I talked to you after you got in trouble after—and the first time I talked to your parents. That day was crazy. I didn't want to like you. What a difference a year makes. That was also the first time I talked to Kristina too, crazy day.

She said there was "no significance to [this text] necessarily, just that [she could not] believe it's been a year since we've actually known you."

The Defendant also sent J.J. a text on October 17, 2017, that stated, "Please remember to bring a change of clothes." She said she sent this text because J.J. was coming to her house after school and she wanted to remind him to bring an extra set of clothes because they were playing basketball and otherwise he would be playing in his school uniform.

The Defendant acknowledged that she sent J.J. a text on October 18, 2017, that stated, "I am outside." She said she sent that text at 2:45 p.m. and that she sent this text to J.J., her daughter, and her other kids letting them know that she was at the school to pick them up.

The Defendant also said she sent the following text to J.J. on October 19, 2017: "Hey, can you come to the restroom in the gym and bring the lavender oil down here, please?" She claimed that she asked J.J. to bring the lavender oil for Kristina at 8:15 a.m. because Kristina had burned herself working in the kitchen. She said she did not remember "why [she] had given [J.J.] some lavender oil at some time before that[,]" but she "had[,] and he had it at the school[,]" and she asked him to bring it down to the restroom. She said that she was not at the school when she sent the text, and that she did not know if J.J. actually brought the lavender oil down that day.

At the conclusion of trial, the jury convicted the Defendant of the charged offenses of statutory rape by an authority figure in Counts 1 and 3 and the lesser included offense of aggravated statutory rape in Counts 2, 4, and 5. Following a sentencing hearing, the trial court imposed an effective sentence of twenty-four years with release eligibility after service of thirty percent of the sentence in confinement.

Thereafter, the Defendant timely filed a motion for new trial. A new attorney was substituted as Defendant's counsel, and he filed three amended motions for new trial. Following a hearing, the trial court denied the motion for new trial. The Defendant then timely filed a notice of appeal.

## ANALYSIS

**I. Sufficiency of Evidence.** The Defendant argues that the evidence is insufficient to sustain her convictions for statutory rape by an authority figure in Counts 1 and 3. The Defendant does not dispute that sexual penetration occurred. Instead, she claims that the State failed to prove that she had attained a "position of trust" at the time the sexual acts in Counts 1 and 3 occurred or that she used this "position of trust" to "accomplish" those sexual acts, either through direct or circumstantial evidence. See Tenn. Code Ann. § 39-13-532(a)(3)(A). Consequently, the Defendant asks this court to reverse her convictions in Counts 1 and 3, to modify them to the lesser included offense of aggravated statutory rape, and then to remand for a new sentencing hearing because such relief would make her eligible for alternative sentencing. The State counters that it introduced sufficient evidence to support these convictions. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that

the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

After the defense's case-in-chief and following the trial court's final jury instructions but before the parties made their closing arguments, the State made its election of offenses. The State elected the following offense for Count 1:

> For count one, the State is alleging the second incident described by [J.J.], which was sexual intercourse with [the Defendant] in her house on a weekend when her whole family had gone somewhere. No one was home. [J.J.] believed [Evans's son] was there. [The Defendant] started stripping down on her bed and they had sex in her bed. A contraceptive was used.

The indictment alleged in Count 1 that the Defendant "between on or about December, 2016 and November, 2017, . . . did unlawfully and knowingly commit sexual penetration with [J.J.], age fifteen (15) years, by having sexual intercourse with him, and [the Defendant] was at least four (4) years older than [J.J.] and was, at the time of the offense, in a position of trust or had supervisory or disciplinary power over him by virtue of [the

Defendant]'s legal, professional or occupational status, and she used the position of trust or power to accomplish the sexual penetration . . . ."

The State then elected the following offense in Count 3:

> Count three is the first incident that was described by [J.J.]. Earlier that day [the Defendant] had been massaging his back, bringing him food and stuff, and later that night she came down and got close and they started making out. They moved to the kitchen, and she performed fellatio on him by placing his penis in her mouth. That was at her home in Hendersonville.

The indictment alleged in Count 3 that the Defendant "between on or about December 01, 2016 and November 30, 2017, . . . did unlawfully and knowingly sexually penetrate [J.J.], age fifteen (15) years, by performing fellatio (oral sex) on [J.J.], and [the Defendant] was at least four (4) years older than [J.J.] and was, at the time of the offense, in a position of trust or had supervisory or disciplinary power over him by virtue of [the Defendant]'s legal, professional or occupational status, and she used the position of trust or power to accomplish the sexual penetration . . . ."

At the motion for new trial hearing, Defendant's appellate counsel argued that "the authority figure statute requires not only that the defendant be in a position of trust but also that the defendant use the position of trust or power to accomplish the sexual contact." However, he asserted that J.J. was never asked, "[D]id you go along with this because . . . you trusted [the Defendant] and she was in a position of trust[?]" Appellate counsel claimed that if this question had been asked, it would have satisfied "the minimum . . . burden of proof" and then it would have come down to "a credibility issue[.]" Appellate counsel said that the State provided no evidence regarding when the Defendant attained a position of trust, how she used the position of trust, and when these offenses occurred:

> [I]in my review of the transcript[,] there w[ere] really no time frames given for a lot of the things, specifically the two counts that the authority figure verdicts were rendered [on], which were, I believe, the first sexual act as well as the first act of sexual intercourse. There was testimony basically that they asked the alleged victim[, J.J.,] what happened. He generally described it, but he didn't say when it happened. He didn't explain that, well, it was because she was my church leader or anything like that. He just said here's what happened. And there was nothing to show not just that she was in a position of trust but how she used the position of trust to accomplish the act.
>
> And, again, because the time frames were never clarified [for] when these things occurred, when did she have this role in church, when did she

have this role with him personally, and then when did the act occur, we don't know the sequence of events. That just simply never came out.

Appellate counsel asserted that because there was no direct testimony from J.J. regarding "this nexus" and because the circumstantial evidence did not have "time frames to connect the things together," there was insufficient evidence to sustain the authority figure convictions, and these convictions should be modified to aggravated statutory rape, which he acknowledged the proof was sufficient to sustain. The trial court noted that more than one witness testified that the victim had been dating the Defendant's daughter, that the Defendant taught the victim as a substitute teacher, that the Defendant was a youth leader to the victim in church activities, and that the Defendant was "a mother figure" to the victim. Appellate counsel responded that he was not saying that the Defendant "could never have been considered an authority figure at any point" but that there was insufficient evidence that the Defendant was an authority figure "at the time that the incidents occurred." The State countered that there was "adequate proof throughout the trial that shows the time frame in which these events occurred" and that the fact that the Defendant accomplished the sexual penetration through her position of authority was "inherent." Ultimately, the trial court concluded that there was abundant proof of "an authority figure type of connection here" and that "according to the jury instructions and what an authority figure is, [the Defendant] met that in three separate ways, with the "major one" being that the Defendant "was considered a mother" by the victim.

As charged in this case, statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when:

(1) The victim is at least thirteen (13) but less than eighteen (18) years of age;

(2) The defendant is at least four (4) years older than the victim; and

(3)(A) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration[.]

Tenn. Code Ann. § 39-13-532(a). "Sexual Penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7); see 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 10.05(d) (footnote 7) (comment 2) (providing an identical definition for sexual penetration in the pattern jury instruction for the offense of statutory rape by an authority figure). "According to the

statute, the State is required to prove that at the time of the offense, the defendant was in a position of trust or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status; the State is not required to prove both." State v. Brian Caswell McGrowder, No. M2013-01184-CCA-R3-CD, 2014 WL 4723100, at *9 (Tenn. Crim. App. Sept. 23, 2014).

In Brian Caswell McGrowder, this court recognized that because the criminal code did not define "position of trust[,]" it had to rely on the principles of statutory construction in order to determine the term's meaning. Id. at *9. The court first considered the plain and ordinary meaning of the term "trust" and then recognized that the Tennessee Supreme Court's opinion in Kissinger provided guidance in determining the meaning of a "position of trust" in a sufficiency of the evidence case. Id. at *10.

In State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996), the Tennessee Supreme Court addressed the abuse of a position of trust within the context of sentencing enhancement. In considering whether the defendant occupied a position of public or private trust for the application of the related sentencing enhancement factor, the Tennessee Supreme Court held that "[t]he determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship." Id. It noted that a court should consider "whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith." Id. It also recognized that "[t]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples" of individuals occupying a position of trust. Id.

After this court's opinion in Brian Caswell McGrowder, the following definition, which was provided to the jury in the Defendant's case, was added as an optional definition to the pattern jury instruction for the offense of statutory rape by an authority figure:

> The determination as to whether or not the defendant was "in a position of trust" with the alleged victim depends not on the length or formality of the relationship, but on the nature of the relationship. You should look to see whether the defendant formally or informally stood in a relationship to the alleged victim that promoted confidence, reliability or faith[.]

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 10.05(d) (footnote omitted).

First, the Defendant claims that the State failed to prove that she had attained a "position of trust" by the time the sexual acts in Counts 1 and 3 occurred. The Defendant asserts that "[a]lthough the indictments specified a range beginning in December 2016," the dates of the incidents charged in Count 1 and Count 3 "were never established by the testimony." She claims that J.J. testified that he began dating the Defendant's daughter

- 30 -

after meeting her at church during the summer of 2016 and then transferring to her school in the fall of 2016; however, she asserts that J.J. never testified to the date when he first met the Defendant or when he and the Defendant had the first two sexual interactions. She maintains that the offenses charged in Counts 1 and 3 "were the first two acts of a sexual relationship that spanned dozens of encounters over several months until the allegations came to light in November 2017, and that even giving the State the strongest legitimate view of the evidence, there was "no way for a rational jury to have concluded the first two sexual acts" occurred after she attained a position of trust because the State failed to establish a timeline. The Defendant insists that most of the State's proof of her "authority figure" status occurred in 2017, when she served as a camp chaperone and substitute teacher, when she picked J.J. up from school, when she occasionally drove him to and from "home schooling" after he was expelled from school in the fall of 2016, and when "she at some point became a mother-like figure to him." However, she claims that there was no evidence that "<u>any</u> of these authority figure-like things occurred before the first two sexual acts" charged in Counts 1 and 3 or that enough of these events had transpired for her to have attained a "position of trust."

The evidence presented at trial shows that the Defendant was in a position of trust when the offenses charged in Count 1 and Count 3 occurred. The proof, when viewed in a light most favorable to the State, shows that the Defendant first cultivated a close relationship with J.J., who was fourteen years old, during the summer of 2016 when J.J. began dating her daughter and when J.J. began participating in the youth group at the Defendant's church, where the Defendant served as a youth leader. By the fall of 2016, before these offenses occurred, the Defendant continued to cultivate her relationship with J.J. when J.J. began attending the church's private school. During this period, the Defendant ingratiated herself with J.J.'s aunt and uncle who had custody of him. Consequently, they gave the Defendant permission to have J.J. come to her home and to have J.J. spend the night, ostensibly for the purpose of J.J. spending time with the Defendant's son and the Defendant's teenage male neighbor. From August 2016 to December 2016, the victim's aunt and uncle allowed the Defendant to drive J.J. home from his "home schooling" sessions several times a week. J.J. testified that during these rides home, he "began to see [the Defendant] as a mother and got really close with her[.]"

Dawn Lesueur also testified that J.J. spent "quite a bit" of time with the Defendant and that the Defendant had "mentioned several times that [J.J.] thought of her as a mother" and that J.J. "wished . . . he had a mother like her." Moreover, the Defendant herself admitted during her testimony that she loved J.J. and that J.J. thought of her as his mother. At the time of the charged offenses, in December 2016 and shortly thereafter, the Defendant was the mother of J.J.'s girlfriend, acted as a surrogate mother to J.J., volunteered as a youth leader in the church youth group that J.J. regularly attended, and was a trusted family friend of J.J.'s family. The proof also showed that from December 2016 to November of

2017, which was the entire length of this inappropriate relationship, the Defendant volunteered as a youth group leader for the church, went on trips, retreats, and summer camp with the church youth, and volunteered at church events for the youth on Wednesday nights, which were all events in which J.J. routinely participated. As a church youth group leader, the Defendant was entrusted with chaperoning, teaching, and guiding all the members of the church's youth group, including J.J. Given this overwhelming proof, we conclude that the evidence was more than sufficient for the jury to find that the Defendant had attained a position of trust at the time that the Defendant committed the offenses charged in Count 1 and Count 3.

Second, the Defendant contends that there was no evidence showing that she "used" her position of trust "to accomplish" the sexual penetration charged in Counts 1 and 3. She claims that while the State could have asked J.J. whether the Defendant's position of trust influenced his decision to engage in sex with her, it never elicited this testimony. She also asserts that there was no circumstantial evidence showing that she used her position of trust to accomplish the sexual penetration. The Defendant argues that because the proof showed that J.J. would have engaged in the sexual activity absent the Defendant's position of trust, the offense committed is aggravated statutory rape, not statutory rape by an authority figure.

Initially, we note that while the statute for the offense of statutory rape by an authority figure prohibits an offender from using his or her position of trust or authority to accomplish the sexual penetration, it says nothing about a defendant using his or her position to force the sexual penetration. See Tenn. Code Ann. § 39-13-532(a); Compare State v. Margaret L. Holt, No. E2010-02128-CCA-R3-CD, 2012 WL 826523, at *16 (Tenn. Crim. App. Mar. 13, 2012) (concluding that the evidence was sufficient to sustain the defendant's conviction for statutory rape by an authority figure when the proof established that the defendant used her position of authority as a teacher's assistant to cultivate an inappropriate relationship with the minor victim and to bring about or bring to completion sexual penetration with the minor victim), with State v. Bryan Dale Farmer, No. M2007-01553-CCA-R3-CD, 2008 WL 3843847, at *7 (Tenn. Crim. App. Aug. 18, 2008) (citing Tenn. Code Ann. § 39-13-527(a) (concluding that the evidence was sufficient to sustain the defendant's conviction for sexual battery by an authority figure because defendant used his position as a teacher or coach to accomplish the sexual contact)).

This court has held that "if the evidence shows that a defendant used his or her position to cultivate an improper relationship with the victim and to bring about or bring to completion sexual penetration with the victim, then this evidence is sufficient to support the conviction for statutory rape by an authority figure." Margaret L. Holt, 2012 WL 826523, at *16 (citing Bryan Dale Farmer, 2008 WL 3843847, at *8); see State v. Theron Antonio Grambling, No. E2014-00248-CCA-R3-CD, 2015 WL 603193, at *5 (Tenn. Crim.

App. Feb. 12, 2015); State v. Henry Wayne Russell, No. M2013-00166-CCA-R3-CD, 2014 WL 1704953, at *11-12 (Tenn. Crim. App. Apr. 29, 2014).

The first incident of sexual contact between the Defendant and J.J. was charged in Count 3. The proof showed that earlier that day the Defendant had massaged J.J.'s back, made him feel comfortable, and brought him food. Later that night, after everyone at the sleepover was asleep, the Defendant came downstairs, got close to J.J., and began kissing J.J. and grabbing his crotch. Then the Defendant and J.J. moved to the kitchen, where the Defendant engaged in fellatio with J.J.

The second incident of sexual contact between the Defendant and J.J. was charged in Count 1. The proof showed that J.J. spent the night at the Defendant's home at a time when the Defendant's entire family was out of town. Evans's son was also present, although he was "oblivious to the whole thing" because he "had his headset on" and was "playing [video]games[.]" The Defendant brought J.J. to her bedroom and "started stripping down[,]" and they "had sex in her bed." He said that they used contraception during that incident.

After reviewing the evidence presented, we conclude that the proof is sufficient to sustain the Defendant's convictions for statutory rape by an authority figure in both Count 1 and Count 3. The proof established that the Defendant would have been unable to initiate her improper relationship with J.J. except through her position of trust. See Brian Caswell McGrowder, 2014 WL 4723100, at *8. Because the proof established that the Defendant utilized her position as the mother of J.J.'s girlfriend, a surrogate mother, a church youth leader, and a trusted family friend to cultivate an inappropriate relationship with J.J. and bring about or bring to completion the sexual penetration with J.J. as charged in these counts, the proof is sufficient to sustain the Defendant's convictions for statutory rape by an authority figure in both Count 1 and Count 3. See Theron Antonio Grambling, 2015 WL 603193, at *5; Margaret L. Holt, 2012 WL 826523, at *16; Henry Wayne Russell, 2014 WL 1704953, at *11-12. Accordingly, the Defendant is not entitled to relief.

**II. Alleged Brady Violation.** The Defendant contends that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose the existence and amount of payments made to Wendy Mallard, and her husband, Tommy Mallard, as reimbursement for their travel expenses, despite the defense's specific request for such evidence prior to trial. She argues that the information regarding these payments meets the first three prongs to establish a Brady violation—the Defendant requested the information, the State suppressed this information, and the information was favorable to the defense—and that the only remaining issue is whether "the information was material." The Defendant insists that the State's payments to the Mallards were material because Wendy Mallard's testimony was "highly significant to the State's case" and "likely guaranteed a conviction

which might not have otherwise occurred" and that the State's "willful withholding" of these payments "impacted" her due process rights, which entitles her to a new trial. The State responds that evidence of these payments was not material. We conclude that the Defendant is not entitled to relief on this issue because she failed to establish all four of the elements required to prove a Brady violation.

The Defendant claims the State's argument that it did not have the documentation regarding these payments until after trial "overlook[s] the fact that the State had actual knowledge the claims would be submitted on the very first day of trial" when the "the State prepared, notarized, and kept the [Mallards'] reimbursement requests" She also asserts that "[t]he fact that the District Attorney waited until weeks after the trial to file the requests ex parte . . . deprive[d] the Defense of any way to discover the requests." The Defendant contends that if this court were to distinguish situations, like this one, where the State guarantees payments but has not yet disbursed the funds, the State could avoid disclosing any sort of payments so long as the payments are made after trial. The Defendant also argues that because Code section 40-17-208 provides that witnesses "shall" receive such reimbursement, the State cannot argue that these payments were "only speculative" at the time of trial. She also asserts that the defense should not have been required to assume that any out-of-state witnesses would be compensated.

The Defendant notes that Wendy Mallard's testimony was "profoundly important" because it "squarely contradicted" her own testimony at trial, namely that J.J. forced himself on her and then blackmailed her to continue the sexual. She states that Wendy Mallard testified that the Defendant was "giddy, very excited[,] and happy" about her relationship with J.J. She also notes that Wendy Mallard testified that the Defendant told her about her multiple orgasms, about how the Defendant and J.J. had sex in every room of the house, about how happy the Defendant was because she thought she was pregnant, and about how the Defendant wanted to marry J.J. The Defendant argues that Wendy Mallard's testimony "was by far the strongest direct evidence of the true nature of [the Defendant's relationship with J.J.] from [the Defendant]'s own words" and that without it, "the case would have turned much more on circumstantial evidence and subjective factors such as credibility." She adds that without the information that Wendy and Tommy Mallard "requested hundreds of dollars in compensation," her attorney had "little with which to challenge [Ms. Mallard's] credibility, motive, or bias." She insists that "[f]inancial compensation is certainly an objective ground to challenge bias" and that the State's compensation to the Mallards was material to her case.

In addition, the Defendant argues that the compensation and related testimony were significant because Wendy Mallard received $656.96 from the State and her husband received $761.13, for a total of $1,418.09. She claims Wendy Mallard would have jointly benefitted from her husband's share as his wife. She also observes that although the State

claimed in its Petition for Trial Expenses that "Tommy Mallard was a vital and necessary witness for the State of Tennessee, the State never called Tommy Mallard to testify, which resulted in the Mallards receiving an all-expenses-paid trip to Tennessee in exchange for Wendy Mallard's testimony, which spanned only twenty-three pages of transcript.

The record shows that on March 6, 2018, the Defendant filed a discovery request, seeking evidence of "[a]ny money or other remuneration paid to any witness by the State, including, but not limited to, rewards, subsistence payments, expenses or other payments made for specific information supplied to the State." On February 12, 2019, the first day of the Defendant's trial, the Mallards signed "State of Tennessee Claim for Advance Witness Transportation Expense" forms stating that travel from Charlotte, North Carolina to Gallatin, Tennessee was necessary; the Mallards' signatures on these forms were notarized by the administrative assistant for the district attorney general, and the district attorney general also signed these claim forms after the Defendant's trial. On March 5, 2019, the district attorney general filed a "Petition for Travel Expense" for the Mallards, which stated that Wendy and Tommy Mallard were "vital and necessary witness[es] for the State of Tennessee"; that the Mallards made one round-trip from Charlotte, North Carolina, to Gallatin, Tennessee; that the Mallards were entitled to certain amounts for car rental costs, parking, and meals, as indicated on the attached Claim for Witness Fee Reimbursement; and that the Mallards' airfare would be "paid by the District Attorney's Office from the Fraud and Economic Crimes Fund" and then said amount would be "reimbursed to the Fraud and Economic Crimes Fund after all costs are paid by the State."

Thereafter, on March 5, 2019, the trial court entered orders granting the State's petitions and approving the payments on the basis that the Mallards were "necessary witness[es] in the above styled case." On March 7, 2019, the circuit court clerk signed a "State of Tennessee Claim for Witness Fee Reimbursement" form, approving the Mallards' claims for reimbursement. These forms, which noted that the Mallards were not reimbursed for their lodging because they stayed with family during the trial, showed that the circuit court clerk approved the following payments to Wendy and Tommy Mallard:

**WENDY MALLARD:**

|  | $574.46 | (airfare) |
|---|---|---|
|  | $82.50 | (dinner or meals & incidentals) |
| TOTAL: | $656.96 | |

## TOMMY MALLARD

|  | | |
|---|---|---|
| | $574.46 | (airfare) |
| | $82.50 | (dinner or meals & incidentals) |
| | $71.82 | (car rental) |
| | $15.35 | (replacement fuel for the rental car) |
| | $20.00 | (airport parking) |
| TOTAL: | $764.13 | |

Receipts for the Mallards' airfare, car rental, fuel, and parking were admitted as exhibits to the motion for new trial hearing. The airfare receipts showed that the Mallards left Charlotte at 7:05 a.m. on February 11, 2019, and returned to Charlotte the following day at 11:10 p.m.

At the motion for new trial hearing, the Defendant's appellate counsel submitted an affidavit from the Defendant's trial counsel, stating that he did not learn the State had requested travel compensation for any trial witnesses or that such compensation had been provided to trial witnesses until several months after the Defendant's trial. This affidavit was also made an exhibit to the hearing. The Defendant's appellate counsel argued that the defense had made a discovery request for all compensation made to State witnesses, that such compensation was considered favorable evidence to the extent that it "could go to a witness's credibility or motive for testifying[,]" and that the State had failed to disclose this information, which was why he claimed this was a "Brady violation meriting a new trial." Appellate counsel acknowledged that he was "not suggesting that the travel payment in and of itself was improper" because Code section 40-17-208 permitted such payment; instead, he was arguing that because the State requested such payments, filed a motion, and then asked the court to approve such payments, without informing the defense after a specific request for that information was made, that the State had violated Brady.

Appellate counsel also noted that this was a "he-said-she-said" case and that the State put on Wendy Mallard as its first witness because the Defendant had told Wendy "about what happened [with J.J.] in a light that was not consistent with her position at trial[.]" The trial court acknowledged that Wendy Mallard was "a pretty informative witness[,]" who testified at trial that the Defendant was "giddy, happy, and excited about this relationship [with J.J.]," and that the Defendant had challenged Mallard's testimony at trial. Appellate counsel argued that the fact that the Mallards received compensation would be an impeachable matter because the Mallards could have been asked if they were paid for their testimony. When questioned by the trial court, appellate counsel affirmed that the State's failure to disclose travel reimbursement for two out-of-state witnesses was so severe that it was reversible error. He explained that because "discovery of favorable evidence is

such an important part of the adversarial process" and the defendant's "right to present a defense," the courts are very lenient in what they consider to be reversible Brady violations.

In response, the State noted that pursuant to Code section 40-17-208, if an out-of-state witness is summoned to testify in this state, the witness "shall be tendered compensation [for expenses so incurred." It asserted that the defense knew that Wendy and Tommy Mallard were on the witness list and that they lived in North Carolina and, therefore, should have known that they would receive such funds for their travel expenses. The State emphasized that it merely "reimburse[d] [the Mallards'] travel expenses," which was "required" by the statute and was not done "until well after the trial[.]" Finally, the State maintained that it was not obligated to provide evidence regarding these claims because the claims were not "approved" by the circuit court clerk until March 7, 2019, which was nearly a month after the Defendant's trial.

At the conclusion of the hearing, the trial court stated, "There's no question here that it could be material and used as impeachment, but there was no suppression here." The trial court, noting that it did not sign the order for reimbursement until March 5, 2019, found that the State did not suppress this information because "[t]he State didn't even have this documentation until after the trial. The trial court added, "[G]oing a little bit further, I don't believe this issue, in the whole scheme of things, is one that would really affect this trial one way or the other."

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution guarantee every defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). In Brady, 373 U.S. at 87, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

In order to prove a Brady violation, the defendant must establish the following four elements:

1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2) that the State suppressed the information;

3) that the information was favorable to the accused; and

4) that the information was material.

Johnson, 38 S.W.3d at 56 (citing State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995)).  The defendant has the burden of proving a Brady violation by a preponderance of the evidence.  See Edgin, 902 S.W.2d at 389. When considering a Brady claim, this court reviews the trial court's findings of fact, such as whether the defendant requested the information or whether the State withheld the information, de novo with a presumption that the findings are correct unless the evidence preponderates otherwise, while this court reviews the trial court's conclusions of law, including whether the evidence was favorable to the accused or material, de novo with no presumption of correctness.  Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

The "prosecution is not required to disclose information that the accused already possesses or is able to obtain."  State v. Marshall, 845 S.W. 2d 228, 233 (Tenn. Crim. App. 1992).  "When exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'" Id. (quoting United States v. McKenzie, 768 F.2d 602, 608 (5th Cir. 1985)).

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses."  Johnson, 38 S.W.3d at 55-56; Walker, 910 S.W.2d at 389; see State v. Jackson, 444 S.W.3d 554, 593 (Tenn. 2014).  In addition, "[e]vidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Johnson, 38 S.W.3d at 58 (quoting Edgin, 902 S.W.2d at 390) (emphasis added)).   When determining whether a defendant has adequately established the materiality of favorable evidence suppressed by the State, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.'"  Id. (quoting Irick v. State, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998)).

In Kyles v. Whitley, 514 U.S. 419, 435 (1995), the United States Supreme Court outlined the proper test for materiality:

[The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the

government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S., at 678, 105 S. Ct., at 3381.

Id. at 434.

"Failing to disclose Brady materials may impair the adversary process in various ways, including causing the defense to 'abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued.'" Jackson, 444 S.W.3d at 595 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). Defendants seeking to establish the materiality element for a Brady violation should emphasize "any and all ways in which suppression of evidence impaired the adversary process and undermined confidence in the outcome of the proceeding." Id.

The Defendant cites two Sixth Circuit cases, Thomas v. Westbrooks, 849 F.3d 659 (6th Cir. 2017) and Robinson v. Mills, 592 F.3d 730 (6th Cir. 2010), to support her claim that the State's payment of the Mallards' travel expenses was material evidence under Brady. In Thomas v. Westbrooks, 849 F.3d at 661-64, Thomas appealed the district court's denial of his habeas corpus petition from his state court conviction for felony murder, alleging that the State violated Brady when it failed to inform him that Angela Jackson, a key witness who testified against him, received $750 from the FBI prior to his state trial. The Sixth Circuit held that because Jackson provided the only reliable testimony placing Thomas at the scene of the shooting and because the jury did not hear any evidence regarding Jackson's pecuniary bias, the FBI's payment to Jackson of $750 was material to the jury's finding of guilt for the charge of felony murder, and therefore, violated Brady. Id. at 666.

Remarkably, the Defendant failed to mention that on the exact same day, the Sixth Circuit also filed Thomas v. United States, 849 F.3d 669 (6th Cir. 2017), a companion case to Thomas v. Westbrooks, 849 F.3d 659 (6th Cir. 2017), which involved the same petitioner, Andrew Lee Thomas, and the same underling facts but concerned Thomas' appeal from the district court's order denying his habeas corpus petition from his federal convictions for robbery affecting commerce, using a firearm during a crime of violence, and being a felon in possession of a firearm. 849 F.3d at 673. In this companion case, Thomas argued that the Government violated Brady when it failed to disclose evidence that it intended to pay Angela Jackson for her federal testimony. Id. at 680. The court recognized that "[t]he timing of the payment to Angela Jackson, which took place after the federal trial but before the state trial, causes Thomas's federal Brady claim to fail. Id. The court noted that a U.S Marshall on Thomas's case had submitted an affidavit stating that "Angela Jackson had not been informed ahead of time that she would be compensated for her cooperation or that she was at risk of facing prosecution for assisting Thomas." Id. This U.S. Marshall also stated that "investigators did not anticipate, plan, or discuss with

Angela Jackson a payment to be made to her after the federal trial." Id. The court emphasized that Thomas was unable to present proof that Jackson knew prior to her federal testimony that she would receive the money or that Jackson had made a deal to testify in the federal trial in lieu of being prosecuted. Id. Ultimately, the court held,

> If the Government had the ability or obligation to disclose to Thomas the eventual compensation [to Jackson], it is plausible that the withholding of evidence might have affected the outcome of the case. But during the federal trial the Government had no obligation to disclose to the defendant whether it was considering the eventual payment to Jackson.

Id.

The Defendant also cites to Robinson v. Mills, 592 F.3d 730 (6th Cir. 2010), to support her claim that the State's payment of the Mallards' travel expenses was material evidence under Brady. In Robinson, a warden appealed the grant of a conditional writ of habeas corpus after the district court found that the State violated Brady by withholding impeachment evidence. Id. at 731. The Sixth Circuit found that the State's key witness, who was the only person to contradict the defendant's claim of self-defense, had been paid by various law enforcement agencies on numerous occasions for her cooperation as a confidential informant in unrelated cases and that this witness "had a working relationship with law enforcement, including the agencies spearheading the investigation of this case." Id. at 738. Consequently, the court held that Robinson was entitled to present such evidence to the jury in order to call into question the witness's credibility and truthfulness. Id.

We believe that the cases cited by the Defendant, Thomas v. Westbrooks, 849 F.3d 659 (6th Cir. 2017) and Robinson v. Mills, 592 F.3d 730 (6th Cir. 2010), are distinguishable from the Defendant's case. In Thomas v. Westbrooks, the key witness was paid for her testimony before the state trial. In Robinson, the key witness was a confidential informant who had been repeatedly paid to cooperate in unrelated prosecutions and was closely associated with the agency investigating Robinson's case. Both involve cases of clear witness bias.

We now turn to the case at hand. The Defendant clearly established the first element required to prove a Brady violation because the defense made a discovery request seeking "[a]ny money or other remuneration paid to any witness by the State, including, but not limited to, rewards, subsistence payments, expenses or other payments made for specific information supplied to the State." However, it is less clear whether the Defendant established the second, third, and fourth elements required to prove a Brady violation.

- 40 -

For the second element, the Defendant must prove that the State suppressed the information regarding the travel reimbursement payments. Although the Mallards made claims for advance witness transportation expenses on February 12, 2019, the first day of the Defendant's trial, the Mallards' claims were not approved for payment by the circuit court clerk until three weeks after the Defendant's trial. In considering whether the Defendant established this second element, we recognize that because the administrative assistant to the district attorney general notarized the Mallards' signatures on this claim form on February 12, 2019, the State was aware that the Mallards had made a claim for such travel expenses and also knew, based on Code section 40-17-208, that the grant of travel reimbursement expenses for out-of-state witnesses was a foregone conclusion.

However, the State insists that it notified the defense that it had summoned Wendy and Tommy Mallard, out-of-state witnesses, to testify at the Defendant's trial, a point that the Defendant does not challenge. Consequently, the defense was also presumed to know that the Mallards would, at some point, receive reimbursement for their travel expenses pursuant to Code section 40-17-208. See Marshall, 845 S.W. 2d at 233; see also Byrd v. Collins, 209 F.3d 486, 517 (6th Cir. 2000) (citations omitted) ("No Brady violation exits where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source."), superseded by statute on other grounds as stated in Stewart v. Winn, 967 F.3d 534, 540 (6th Cir. 2020). It is also worth noting that although the defense asked for evidence of "payments" in its discovery request, no reimbursement "payments" had been made to the Mallards at the time of the Defendant's trial. See Donald Wayne Strouth v. State, No. 03C01-9507-CC-00195, 1997 WL 90636, at *8 (Tenn. Crim. App., at Knoxville, Mar. 4, 1997) ("Any evidence that came into existence after appellant's trial does not fall within the purview of Brady and cannot logically be considered suppressed by the State."). While the Defendant suggests that the State deliberately submitted the Mallards' reimbursement claims for approval after her trial, there is no evidence in the record to substantiate that claim.

For the third element, the Defendant must establish that the information was favorable to her. The Defendant claims that information regarding payment of the Mallards travel reimbursement was favorable because it could have been used to impeach Wendy Mallard. Specifically, she claims that Wendy Mallard could have been asked if there was a connection between the travel reimbursements given to Wendy and Tommy Mallard and the substance of Wendy Mallard's testimony, which would have suggested to the jury that Wendy Mallard was a biased or unreliable witness. See Johnson, 38 S.W.3d at 55-56 (stating that favorable evidence for Brady includes "evidence that could be used to impeach the State's witnesses"); State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001) (acknowledging that a defendant has the right to establish a witness's bias based on "promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness" and

that exposure of a witness's motivation in testifying is an appropriate and essential function of the right of cross-examination). In considering this third element, we fail to see how the Defendant could have effectively used this information to impeach Wendy Mallard. The Mallards were not enriched by reimbursement of their travel expenses; in fact, the reimbursement of their travel expenses simply put the Mallards in exactly the same financial position that they held prior to trial. As opposed to a payment, a bribe, or a promise of leniency, the payments in this case were merely a reimbursement for the Mallards' out-of-pocket travel expenses related to the Defendant's trial. Accordingly, we fail to see how such reimbursement affected Wendy Mallard's credibility or made her biased.

Even if we were to assume, without making such a determination, that the Defendant established that the State suppressed information and that this information was favorable to the accused, the Defendant has failed to establish that the information regarding reimbursement of the Mallards' travel expenses was material. The Defendant has not shown that "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Johnson, 38 S.W.3d at 58 (quoting Edgin, 902 S.W.2d at 390). Although the Defendant claims she could have used this information to show that Wendy Mallard was financially motivated to testify against her based on the prospect of receiving this travel reimbursement, which she characterizes as an "all-expenses-paid vacation" for the Mallards, the proof actually shows that the Mallards spent less than thirty-eight hours in Gallatin for the Defendant's trial and that the overwhelming majority of this reimbursement amount went toward the Mallards' airline tickets. Considering this evidence, we cannot conclude that the State's alleged suppression of information regarding the Mallards' reimbursement of their travel expenses undermined confidence in the Defendant's trial. No rational jury would have believed that such reimbursement would have caused Wendy Mallard to testify untruthfully at trial. Because the Defendant has failed to establish that such information was material for the purpose of proving a Brady violation, she is not entitled to relief.

**III. Sufficiency of the Evidence and Modified Unanimity Jury Instruction in Count 4.** The Defendant contends that the trial court erred in not providing a modified unanimity instruction for Count 4. See State v. Qualls, 482 S.W.3d 1, 17 (Tenn. 2016) (holding that the election doctrine does not require the prosecution to identify a single incident in generic evidence cases but that in cases where the prosecution is based solely on such generic evidence, the election doctrine is satisfied by providing the jury with a modified unanimity instruction that allows conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim). She also asserts that the evidence is insufficient to sustain her conviction for aggravated statutory rape in Count 4. The Defendant maintains that "[b]etween the absence of specific testimony that sexual intercourse occurred in the van and the trial court's failure to provide a modified unanimity

instruction, her conviction in Count 4 must be reversed." In response, the State argues that it elected distinguishable criminal acts that did not require the trial court to give a modified unanimity instruction and that it presented sufficient evidence to sustain the Defendant's aggravated statutory rape conviction in Count 4. We conclude that it would have been inappropriate for the trial court to provide a modified unanimity instruction to the jury and that the evidence is sufficient to sustain the Defendant's conviction for aggravated statutory rape in Count 4.

A. **Modified Juror Unanimity Instruction.** First, the Defendant asserts that J.J.'s testimony about the offense charged in Count 4 was "'generic evidence' with no particular date or sex act . . . identified," which should have prompted the trial court to provide a modified unanimity instruction sua sponte with regard to Count 4. She maintains that the trial court's failure to provide this instruction was in direct violation of Qualls. She also asserts that because J.J. only provided vague testimony for this count, namely that he and the Defendant had sex on the road beside her house "multiple times" and included "oral— all of—everything," this meant that every type of sexual penetration described in the statute occurred, even though J.J. never testified that many of these types of sexual penetration occurred on other occasions. The Defendant contends that because the jury acquitted her on three of the five counts of statutory rape by an authority figure, "the erroneous jury instruction [in Count 4] requires more scrutiny here than in cases where the jury entirely rejected the defense."

Count 4 of the indictment provided that "between on or about December 2016 and November 2017," the Defendant "did unlawfully and knowingly commit sexual penetration with [J.J.] . . . by having sexual intercourse with him" and the Defendant "was at least four (4) years older than [J.J.] and was, at the time of the offense, in a position of trust or had supervisory or disciplinary power over him by virtue of [the Defendant]'s legal, professional or occupational status, and she used the position of trust or power to accomplish the sexual penetration . . . ." The State made the following election for Count 4: "[O]n a road directly behind their house, [the Defendant] took him there and they had sexual intercourse in the van."

The only other count describing sexual intercourse in the Defendant's van was Count 2, for which the State provided the following election:

> For count two, [the Defendant] took [J.J.] in her van and dropped all the kids off. They were at the end of a dead-end road and they got in the back of the van and had sex again. Afterwards the van would not start. It was very scary. [The Defendant] went door-to-door knocking for someone to jump the car off. A man came down and helped jump the car, and [the Defendant] told the man that [J.J.] was her son.

- 43 -

The Defendant asserts that the following proof presented at trial regarding Count 4 is exactly the type of "generic evidence" deemed problematic in Qualls:

Q.    . . . I need you to tell the ladies and gentlemen of the jury what you remember [about] the next time that you had relations with [the Defendant].

A.    . . . [S]he would take me in her van a lot of times, . . . a lot of times she would tell her husband that she was going somewhere where she wasn't actually going. . . . It would also happen—there was this road that it would happen a lot at.  It was right behind her house and—

Q.    And that was in Hendersonville?

A.    Yes, sir.  And—

Q.    This road that you're talking about that you went down, was it close to her house?

A.    The one behind her house or the dead-end?

Q.    The dead-end road.

A.    Okay.  That one was right beside her house, like right down the road.

Q.    And that was in Hendersonville?

A.    Yes, sir.

Q.    And you talked about this road that was behind her house.  What happened at the road behind her house?

A.    I mean, she brought me there to have sex multiple times.

Q.    When you said "have sex," different kinds of sex?

A.    Oral—all of—everything.  Oral sex, everything.

Q.    Did you have intercourse during those periods of times?

A.    Yes, sir.

- 44 -

When considering this issue at the motion for new trial hearing, the trial court held only that "the election issue is not well-taken[.]"

The Defendant argues that the aforementioned testimony is the type of "generic evidence" identified in Qualls as problematic and that the remedy is for the trial court to provide "a modified unanimity instruction that allows a conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim." Id. She claims that because the trial court did not provide a modified unanimity instruction in her case, the jury instructions were in direct violation of Qualls, and this court must apply a constitutional harmless error analysis, which requires this court to determine, after examining the record, "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 18 (quoting State v. Climer, 400 S.W.3d 537, 569 (Tenn. 2013)). The Defendant insists that "[i]n light of the particular circumstances of this case, the State cannot meet its burden to show the error [in not charging the modified unanimity jury instruction] was harmless beyond a reasonable doubt." Accordingly, the Defendant argues that "Count Four must be vacated."

Although we recognize that the election of offenses in this case took place at the end of the defendant's case-in-chief, rather than at the conclusion of the State's case-in-chief, neither side raised any issue regarding the timing of the State's election. See Qualls, 482 S.W.3d at 10 ("The election [of offenses] must be made at the conclusion of the State's case-in-chief."). Even if the timing of the State's election was error, such error was harmless because we conclude beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. See id. (noting that while the election doctrine assists the defendant in preparing for and defending against specific charges, protects the defendant from double-jeopardy concerns, enables the trial court to review the weight of the evidence as the thirteenth juror, and helps an appellate court review the legal sufficiency of the evidence, the most important purpose served by the election doctrine is to ensure juror unanimity); State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (holding that when an appellate court conducts a harmless error analysis, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making"). From opening statements forward, the Defendant pursued a defense theory wherein she acknowledged that the incidents of sexual penetration occurred but claimed that J.J. had forced himself on her and then blackmailed her to continue their sexual relationship. At trial, the Defendant acknowledged that at least twenty incidents involving sexual penetration between the Defendant and J.J. occurred, and the Defendant provided evidence in support of the aforementioned defense theory. Thereafter, the trial court provided the jury with the general unanimity instruction as a part of its concluding instructions, see 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 43.02, and the State elected the specific

incidents for which it was seeking conviction in all five counts. Accordingly, we conclude that any error regarding the timing of the State's election was harmless.

In Qualls, the Tennessee Supreme Court distinguished between "non-generic" and "generic" evidence in child sexual abuse cases. Qualls, 482 S.W.3d at 16-17. The court held that in cases where the prosecution presents "non-generic evidence of distinguishable criminal acts, the prosecution must elect the specific act for which it seeks conviction in a manner that identifies the prosecuted offense of the jury." Id. at 16. However, the court held that where the prosecution presents non-specific or "generic evidence" such as where the child victim testifies to "repeated incidents of sexual contact occurring over a substantial period of time but is unable to furnish specific details, dates, or distinguishing characteristics as to individual incidents" the prosecution "need not elect a specific criminal act or incident as the basis of a conviction for each charge"; instead, the election requirement may be satisfied by the "the trial court providing a modified unanimity instruction that allows a conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim." Id. at 17, 19. The court made it clear that there is no need for the trial court to provide a modified unanimity instruction "[w]here the prosecution presents non-generic evidence of distinguishable criminal acts." Id. at 16.

Because questions involving the propriety of jury instructions are mixed questions or law and fact, this court's standard of review is de novo with no presumption of correctness. State v. Benson, 600 S.W.3d 896, 902 (Tenn. 2020). After carefully evaluating the record in this case, we conclude that the prosecution presented non-generic evidence for all the counts in the indictment, including Count 4. We also conclude that the State made a proper election in Count 4. Moreover, because the State presented only non-generic evidence for all the counts of the indictment, the trial court was not required to provide a modified unanimity instruction to the jury. See Qualls, 482 S.W.3d at 16.

At trial, J.J. testified that there were many instances in which he and the Defendant had sexual intercourse in the Defendant's van on a road behind the Defendant's home. We note that "where [an] indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible." State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994). However, to ensure juror unanimity, the prosecution, pursuant to the election of offenses doctrine, has a duty to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt. Qualls, 482 S.W.3d at 9-10 ("The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt."). The election requirement supplements the general unanimity instruction and helps "ensure the jury understands its obligation to agree unanimously that the defendant

committed the same criminal act before it may convict the defendant of a criminal offense." Id. at 10 (citing State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999)).

The Tennessee Supreme Court has recognized that "'[t]here is no right to a perfect election, and indeed, . . . the election requirement may be satisfied in a variety of ways.'" Qualls, 482 S.W.3d at 10 (quoting State v. Knowles, 470 S.W.3d 416, 424 (Tenn. 2015)). In fact, "'[a]ny description that will identify the prosecuted offense for the jury is sufficient." Knowles, 470 S.W.3d at 424. The State may elect offenses by narrowing the multiple incidents by asking the victim to relate any of the incidents to a specific month, by identifying a particular type of abuse, or by specifying the unique surroundings or circumstances that help identify an incident. Qualls, 482 S.W.3d at 10-11; State v. Shelton, 851 S.W.2d 134, 138 (Tenn. 1993). However, because the election requirement applies to offenses, not the facts supporting each element of the offense, a jury is not required to "unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged." State v. Adams, 24 S.W.3d 289, 297 (Tenn. 2000); see Knowles, 470 S.W.3d at 424.

Although J.J. was unable to provide a specific date for the offense charged in Count 4, he was able to sufficiently identify this offense by providing specific details and distinguishing characteristics that accompanied this offense. J.J. testified that he and the Defendant had sexual intercourse in the van on the road behind her home on multiple occasions. By his testimony, J.J. identified the type of sexual penetration, namely sexual intercourse, and identified the location and specific circumstances, namely on a road behind the Defendant's house and in the Defendant's van. Thereafter, the State properly elected one of the distinct offenses that was supported by J.J.'s testimony in Count 4. Specifically, for Count 4, the prosecutor made the following election, "[O]n a road directly behind their house, [the Defendant] took him there and they had sexual intercourse in the van." Although the proof established that this type of incident occurred multiple times, only one offense was charged, and one offense was elected. Accordingly, the prosecution's election of the type of sexual penetration—intercourse—as well as the place and the particular circumstances surrounding this event was "sufficiently specific . . . to safeguard the defendant's right to a unanimous verdict" on this offense. Knowles, 470 S.W.3d at 424-25. For these reasons, we conclude that the State's election in Count 4 was proper. We also note that the offense elected in Count 4 was sufficiently distinguishable from the offense in Count 2 because in Count 2, J.J. testified that the Defendant dropped off her kids, they went to the end of a dead-end road, the van would not start, the Defendant had to go door-to-door to get help, and the Defendant told the man with the jumper cables that J.J. was her son and they were looking at the house that was for sale at the end of the dead-end road, which are all facts that distinguished Count 2 from the distinct offense charged in Count 4.

As an alternate argument for the modified unanimity instruction, the Defendant claims that J.J. exaggerated his "vague testimony" that they had sex "down the road" beside her house "multiple times" that included "oral—all of—everything. Oral sex, everything." Noting that the definition of "sexual penetration" includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body," the Defendant asserts that because J.J. testified that they engaged in "everything," this meant that every type of sexual penetration occurred, even though J.J. never testified that many of these types of sexual penetration occurred on other occasions. We have already recognized that J.J. testified to, and the State elected, the specific type of sexual penetration—sexual intercourse—in Count 4. Accordingly, the Defendant is not entitled to relief on this issue.

**B.** **Sufficiency of the Evidence.** The Defendant also argues that the evidence is insufficient to sustain her aggravated statutory rape conviction in Count 4, even though she acknowledges in another section of her brief that "the evidence was sufficient for conviction on aggravated statutory rape for all five counts" because "there was no dispute she had sexual relations with a minor, and clearly the jury did not accredit her testimony that she acted out of duress." In any case, the Defendant claims the evidence is insufficient to sustain her conviction in Count 4 because J.J. never specifically testified that the elected sexual act, sexual intercourse, occurred in the van behind her house. Instead, she asserts that J.J. testified that he and the Defendant engaged in "[o]ral—all of—everything. Oral sex, everything. The Defendant argues that "the literal meaning of [J.J.'s testimony] was that [he and the Defendant] engaged in every possible sex act, which cannot fairly be understood to mean any particular sex act other than 'oral sex,' which he specifically mentioned." Although the Defendant acknowledges that the State asked the follow-up question, "Did you have intercourse during those periods of time?," and J.J. responded affirmatively, she claims that J.J.'s response "only mean[t] they engaged in intercourse during a period of time in which they were also engaging in certain acts in the van, not that they necessarily engaged specifically in intercourse in the van."

Aggravated statutory rape is the "unlawful sexual penetration of a victim by the defendant, or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least ten (10) years older than the victim." Tenn. Code Ann. § 39-13-506(c). The Defendant cites State v. Edward G. Jameson, No. M2020-00945-CCA-R3-CD, 2021 WL 3360976 (Tenn. Crim. App. Aug. 3, 2021), to support her claim that the evidence is insufficient to sustain her conviction in Count 4. In Edward G. Jameson, this court reversed a conviction for incest where the victim's testimony "clearly establishe[d] that she and the Defendant engaged in a sexual relationship over a period of years" but the "[t]he victim never confirmed, denied, or even commented on the State's subsequent assertion that the victim and the Defendant had sex

- 48 -

in the graveyard[,]" which was the location included in the State's election for this offense. Id. at *5. Unlike the victim in Edward G. Jameson, J.J. testified that the Defendant brought him in her van to the road behind her house "to have sex multiple times." J.J. then confirmed that the type of sex the Defendant had with him on those occasions included sexual intercourse. The jury, based on its verdict in this count, clearly interpreted J.J.'s testimony to mean that the Defendant had sexual intercourse with J.J. in the van on the road behind her house, which we believe was a reasonable interpretation after carefully evaluating the trial transcript in this case. As we previously recognized, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659). In this case, as opposed to the Edward G. Jameson case, there is no question that J.J. supplied sufficient evidence to sustain this count. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

IV. **Admission of Husband's Statements.** Although the Defendant concedes that she waived this court's plenary review of this issue by failing to make contemporaneous objections at trial, she nevertheless asserts that the admission of several hearsay statements by her husband, through four witnesses during trial and the State's reference to such hearsay during closing argument, violated her due process and confrontation rights and constituted plain error. She asserts that "the proper way for the State to introduce this evidence would have been for the State to call [the Defendant's husband] as a witness to inquire as to his knowledge of the relationship [between the Defendant and J.J.]," which would have enabled the defense to cross-examine him "about the basis for his beliefs, whether he made the statements in question, and what he meant if he indeed made the statements." The Defendant claims that, even in the absence of an objection, the trial court should have interjected and instructed the jury to disregard the testimony and the State's argument regarding these hearsay statements. The Defendant insists that the State used testimony from several witnesses to show that the Defendant's trial testimony was untruthful and that the references to the hearsay statements from the Defendant's husband were "fundamentally intertwined with the witnesses' own stories and provided damning additional evidence suggesting [the Defendant]'s own husband was aware of the offensive conduct." In response, the State contends that the Defendant has waived any issues regarding these hearsay statements and that the Defendant is not entitled to plain error relief. We agree with the State.

The Defendant asserts that four witnesses testified to hearsay statements allegedly made by her husband, Brian Tice, who did not testify at trial, and that the State referenced one of these hearsay statements during its closing argument, as shown below:

- 49 -

(1)  Wendy Mallard testified that just after the Defendant's husband, Brian Tice, arrived at her home in North Carolina, Brian "had told [Mallard's] husband 'I think I know what this is about.  It's about [J.J.], isn't it?'"

(2)  Dawn Lesueur testified that the Defendant said her husband was "jealous of [J.J.] and [J.J.] being around."

(3)  Eric Lesueur testified that the Defendant's husband "asked me was she having an affair."

(4) Eric Lesueur testified that the Defendant's husband "asked me not to say anything to anybody, they were working it out."

(5)  K.J. testified that when she suggested that the Defendant was spending too much time with J.J., the Defendant "said that her husband, Brian, had said the same thing."

(6)  The State commented during its closing argument:  "You heard testimony that Brian Tice said, this is about [the Defendant] and [J.J.], isn't it?"

At the motion for new trial hearing, appellate counsel argued that "there were a few witnesses who testified to things that [the Defendant's husband, Brian Tice] had told [them][,]" and that the State had referenced one of Brian Tice's hearsay statements during its closing.  He argued that this evidence, which was offered for the truth of the matter asserted, not only constituted inadmissible hearsay but also violated the confrontation clause because the Defendant's husband did not testify at trial and was not subject to cross-examination.  While appellate counsel acknowledged that trial counsel failed to object to this evidence, he asserted that admission of this "damning evidence" amounted to "plain error."  The trial court responded that trial counsel was "very competent and effective and experienced" and did not object to this evidence, which could have been for "tactical reasons."

The record shows that the Defendant never objected at trial on the basis that the aforementioned statements were inadmissible hearsay and violated the Defendant's constitutional rights.  Accordingly, these issues are waived.  See Tenn. R. App. P 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000) (holding that when a defendant fails to object to the admissibility of evidence, "'the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary,

- 50 -

and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible'") (quoting State v. Harrington, 627 S.W.2d 345, 348 (Tenn. 1981)).

Nevertheless, the Defendant argues that the admission of these statements amounted to plain error. The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

Smith, 24 S.W.3d at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Id. at 283. "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations and internal quotations marks omitted).

The Defendant contends that in admitting the aforementioned hearsay statements, two "clear and unequivocal rule[s] of law [were] breached," namely the hearsay rule and the right to confrontation because these hearsay statements were made by a non-testifying witness and were used against the Defendant. The Defendant also asserts that "[t]here is no possible reason to believe defense counsel would have failed to object to these statements for tactical reasons" because "nothing could be gained by allowing introduction of the testimony or the closing argument." Finally, the Defendant maintains that consideration of the error is necessary to do substantial justice because these hearsay statements were "highly prejudicial" because they allowed the State to insinuate that the Defendant's husband was aware of an inappropriate relationship and once it was discovered by others, the Defendant and her husband conspired to conceal it.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "A 'statement' is (1) an oral or written assertion[.]" Tenn. R. Evid. 801(a).

- 51 -

Generally, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. Whether a statement fits under one of the exceptions to the hearsay rule is a question of law subject to de novo review by this court. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Statement (1) is hearsay. Brian Tice said, "I think I know what this is about. It's about [J.J.], isn't it?," to Wendy Mallard's husband while Wendy Mallard was present, and then Wendy Mallard testified at trial about what Brian Tice said. While the phrase, "It's about [J.J.], isn't it?," is actually in the form of a question, the circumstances in which it was said suggest that Brian Tice intended the phrase as an assertion, not a question. See State v. Brown, 373 S.W.3d 565, 573 (Tenn. 2011) (noting that the defendant's question was actually an assertion offered for the truth of the matter asserted but ultimately concluding that the question was admissible because it was an admission by a party opponent); State v. Flood, 219 S.W.3d 307, 314-15 n.5 (Tenn. 2007) (recognizing that questions are not hearsay if they are "not offered to prove the truth of their content"). Accordingly, we conclude that Brian Tice's question was a statement offered to prove the truth of the matter asserted, namely that he was, to some degree, aware of the Defendant's inappropriate relationship with J.J., and that this statement should not have been admitted if the defense had objected to it on the ground of hearsay.

Statement (2) is merely an admission by the Defendant, as a party opponent. Dawn testified about the Defendant's statement, and the Defendant's statement included a description that her husband was "jealous of [J.J.] and [J.J.] being around," which is not hearsay. Therefore, admission of this statement was proper.

Statement (3) qualifies as an excited utterance, which is an exception to the hearsay rule. Under Tennessee Rule of Evidence 803(2), an "excited utterance" not excluded by the hearsay rule is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In order to meet the excited utterance exception, (1) a startling event or condition must occur that suspends the normal, reflective thought processes of the declarant, (2) the declarant's statement must relate to this startling event or condition, and (3) the declarant must make this statement while under the stress or excitement from the event or condition. State v. Franklin, 308 S.W.3d 799, 823 (Tenn. 2010). At trial, Eric Lesueur testified that he "startled" Brian Tice "early in the morning" around 3:30 or 4:00 a.m. with a plane ticket in hand and "got him out of bed," and Brian Tice "kept asking [him] on the way to the airport what this was all about" and "finally . . . asked [him] was [his wife] having an affair[,]" and Eric told Brian "that she was [having an affair] or it was thought that she was." Here, the startling event was Brian Tice being unexpectedly awakened in the very early hours of the morning and told that he had to fly to North Carolina to see his wife. Brian Tice's subsequent statement about whether his wife was having an affair related to

the startling event, and we believe that Brian Tice made this statement while he was still under the stress from the startling event. Because statement (3) qualifies as a hearsay exception, it was properly admitted.

Statement (4) is hearsay. Eric Lesueur testified that Brian Tice called him "later that day" on "Saturday afternoon" after arriving in North Carolina. He said Brian "asked [him] not to say anything to anybody, [he and his wife] were working it out, that . . . the victim was going to be out of their life and this, that, and the other, and just give them some time." Eric stated that he told Brian "okay" but asserted that he had "told [Brian] when [he] put him on the plane . . . that he needed to take this [information regarding the inappropriate sexual relationship between J.J. and his wife] to the church immediately." Eric then testified that because Brian Tice never informed the church about his wife's criminal conduct, Eric contacted Mike England, a member of the church who was retired law enforcement, about the incident, which resulted in England contacting the church and the allegations against the Defendant coming to light. Again, although what was said is actually in the form of a question, the surrounding circumstances suggest that Brian Tice intended the phrase as an assertion, not a question. Because this statement was offered for the truth of the matter asserted, namely that he did not want Eric to say anything to anybody because he was aware of his wife's criminal conduct and was conspiring with her to cover it up, this statement constituted hearsay. Therefore, this statement should not have been admitted if the defense had objected on the ground of hearsay.

Statement (5) is an admission by the Defendant, as a party opponent, that contains hearsay. K.J. testified that before the summer of 2017, she "told [the Defendant] that [she and B.J.] thought [J.J.] was spending too much time over at the Tice house," and that the Defendant replied that "her husband, Brian, had said the same thing to her before, that . . . she was too involved in the teenagers and what was going on with the teenagers in that group, and it wasn't the first time she heard it, and she understood and she would back off." Here, K.J. testified about the Defendant's statement, and the Defendant's statement included a statement by Brian Tice, the Defendant's husband. While the Defendant's statement would generally be admissible as an admission by a party opponent, we must consider whether the included statement by the Defendant's husband is hearsay for which there is no exception. It appears that the State offered K.J.'s testimony to show the truth of the matter asserted, that J.J. was spending too much time over at the Tice house and that the Defendant was too involved in what was going on with the teenagers in that group, including J.J. Accordingly, if the defense had objected to the statement by the Defendant's husband on the ground of hearsay, this statement should not have been admitted.

Statement (6) is the State's reference, during its closing argument, to Wendy Mallard's testimony that Brian Tice "had told [Wendy Mallard's] husband 'I think I know what this is about. It's about [J.J.], isn't it?'" We have already concluded that Wendy

Mallard's testimony about this statement was hearsay and that if the defense had objected on the ground of hearsay, the statement by Brian Tice should not have been admitted. However, because no objection was made to these particular statements, they were properly admitted as substantive evidence, and the State could properly refer to these statements during its closing argument. See Smith, 24 S.W.3d at 280.

First, the Defendant contends that the trial court violated the hearsay rule and committed plain error when it admitted her husband's statements as substantial evidence. Initially, we acknowledge that a clear and unequivocal rule of law was breached because admission of statements (1), (4), and (5) violated Tennessee Rule of Evidence 802 because they were hearsay. However, in light of the substantial evidence of the Defendant's guilt that was presented at trial and the Defendant's failure to object to these three statements, we disagree that a substantial right of the accused was adversely affected by the admission of these statements. We also conclude that the Defendant has failed to show that she did not waive the issue for tactical reasons. Any objection to hearsay statements (1) and (4) would have emphasized that the Defendant's husband knew that something was inappropriate about the Defendant's relationship with J.J., which cut against the defense theory that the Defendant only committed her criminal acts under duress. Any objection to statement (5) would have emphasized that the Defendant's husband knew the Defendant was voluntarily spending an inordinate amount of time with J.J., which also mitigated her defense of duress. Lastly, we conclude that consideration of the error is not "necessary to do substantial justice." As we previously noted, the Defendant could have objected to these statements and failed to do so. Even if the jury had not considered these hearsay statements, the testimony provided by J.J., Wendy Mallard, Dawn Lesueur, Eric Lesueur, Deanna Campbell, K.J., and B.J. presented substantial evidence of the Defendant's guilt. After considering the proof presented at trial as well as the Defendant's defense theory that she committed these offenses under duress, we conclude that the Defendant has failed to show that admission of statements (1), (4), and (5) amounted to plain error.

Second, the Defendant argues that the trial court violated her constitutional rights of confrontation and committed plain error when it admitted her husband's aforementioned statements. The Confrontation Clause of the Sixth Amendment to the United States Constitution gives an accused the right "to be confronted with the witnesses against him," and this right is applicable to the States through the Fourteenth Amendment. U.S. Const. amend VI, XIV. The Tennessee Constitution also gives an accused the right "to meet the witnesses face to face." Tenn. Const. art. I, § 9. The Tennessee Supreme Court has held, "In deciding issues under the Confrontation Clause in the Tennessee Constitution, we apply the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment to the United States Constitution." State v. Hutchinson, 482 S.W.3d 893, 905 (Tenn. 2015); see State v. Dotson, 450 S.W.3d 1, 62 (Tenn. 2011); State v. Parker, 350 S.W.3d 883, 897-98 (Tenn. 2011). Whether the admission of certain evidence violates a

defendant's confrontation rights is a question of law subject to de novo review.  State v. McCoy, 459 S.W.3d 1, 8 (Tenn. 2014) (citing State v. Lewis, 235 S.W.3d 136, 141-42 (Tenn. 2007)).  The threshold question in every case involving the Confrontation Clause is whether the challenged statement is testimonial.  Hutchinson, 482 S.W.3d at 905 (citing Dotson, 450 S.W.3d at 63); see State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); Crawford v. Washington, 541 U.S. 36, 51-52 (2004).

In Crawford, 541 U.S. at 68, the United States Supreme Court held that testimonial out-of-court statements by a nontestifying declarant may be admitted only if the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant.  The Court noted that "[t]he text of the Confrontation Clause . . . applies to witnesses against the accused—in other words, those who bear testimony."  Id. at 51 (citation and internal quotation marks omitted).  It then defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Id. (citation and internal quotation marks omitted). The Crawford court then provided the following examples of statements that are testimonial:

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it.  Regardless of the precise articulation, some statements qualify under any definition— for example, ex parte testimony at a preliminary hearing.

Id. at 51-52 (citations omitted); see Dotson, 450 S.W.3d at 63-64.  While "[s]tatements taken by police officers in the course of interrogations" qualify as testimonial, "off-hand, overheard remark[s]," "statements in furtherance of a conspiracy," and "business records" are nontestimonial.  Crawford, 541 U.S. at 51-52, 56; see McCoy, 459 S.W.3d at 14.

In Hutchinson, the Tennessee Supreme Court held that when determining whether an out-of-court statement is testimonial, the court must first determine whether the statement's "primary purpose is to prove past events potentially relevant to a criminal prosecution."  Once this threshold is met, the court must consider (1) whether the statement has "indicia of solemnity," as outlined in Justice Thomas's separate concurrence in

- 55 -

<u>Williams</u>, or (2) whether the primary purpose of the statement was to accuse a targeted individual, in accordance with Justice Alito's plurality in <u>Williams</u>. <u>Hutchinson</u>, 482 S.W.3d at 910 (citing <u>Williams v. Illinois</u>, 567 U.S. 50, 82, 110-11 (2012)). The <u>Hutchinson</u> court held that if the statement "meets the threshold standard and either of the latter two standards, it is considered testimonial within the meaning of the Confrontation Clause." <u>Id.</u> at 910-11.

Here, the hearsay statements attributed to the Defendant's husband were not given under circumstances akin to a deposition, affidavit, testimony, or a confession. Therefore, we simply cannot conclude, under the threshold standard stated in <u>Hutchinson</u>, that the primary purpose of these statements was to prove past events potentially relevant to a criminal prosecution. Because these statements were not testimonial, the Confrontation Clause does not preclude their admission at trial. Because the Defendant has failed to show that a clear and unequivocal rule of law was breached, a substantial right was adversely affected, or that consideration of the error is "necessary to do substantial justice," she is not entitled to plain error relief.

**V. <u>Cross-Examination.</u>** The Defendant asserts that she was erroneously deprived of her right to cross-examine J.J. regarding whether he had made statements expressing sexual or romantic interest in other older women. She also argues that she was erroneously deprived of her right to cross-examine B.J. about whether J.J. had been exposed to inappropriate sexual matters in childhood related to his parents being allegedly diagnosed as "sex addicts." The Defendant insists that her convictions should be reversed because the trial court violated her right to present a defense and her right to confront and cross-examine witnesses. In response, the State argues that the trial court properly limited the Defendant's attempt to cross-examine J.J. and B.J. about this inadmissible evidence. We agree with the State.

The Confrontation Clause of the Sixth Amendment and Article I, section 9 of the Tennessee Constitution provide criminal defendants with the right to physically face witnesses and the right to cross-examine witnesses. <u>See</u> <u>State v. Brown</u>, 29 S.W.3d 427, 430-31 (Tenn. 2000) (citing <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 51 (1987); <u>State v. Middlebrooks</u>, 840 S.W.2d 317, 332 (Tenn. 1992)). In addition, the Sixth and the Due Process Clause Fourteenth Amendments and Article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to present a defense. <u>See</u> <u>id.</u> at 432 (citing <u>Taylor v. Illinois</u>, 484 U.S. 400, 408 (1988); <u>Washington v. Texas</u>, 388 U.S. 14, 23 (1976); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973); <u>State v. Sheline</u>, 955 S.W.2d 42, 47 (1997)).

Generally, the propriety, scope, manner and control of the cross-examination of witnesses rest within the sound discretion of the trial court. <u>State v. James</u>, 315 S.W.3d

440, 460 (Tenn. 2010) (citing State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993); State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995)). The right of cross-examination "is subject to the restrictions created by the applicable statutes, rules of evidence, rules of criminal procedure, and the common law rules created by the appellate courts." Adkisson, 899 S.W.2d at 644-45. "'[A] defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation.'" State v. Wyrick, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001) (quoting State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994)). "The scope of cross-examination is largely in the discretion of the trial court[,] and its ruling will not be disturbed absent an abuse of discretion to the manifest prejudice to the complaining party." State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

**A. Statements Expressing Sexual or Romantic Interest in Older Women.** The Defendant claims that J.J.'s statements about finding older women attractive not only helped to support her duress defense but also helped to attack the "authority figure" charges by showing that J.J. was interested in a relationship with her because of her age rather than her alleged position of trust. She also asserts that this evidence was relevant under Tennessee Rule of Evidence 402 and did not qualify as "sexual behavior" under Rule 412, which defines "sexual behavior" as "sexual activity of the alleged victim other than the sexual act at issue in the case." See Tenn. R. Evid. 412(a). Finally she claims that evidence of J.J.'s assault of Kristina Evans should have been admissible both as evidence of J.J.'s interest in older women, like the Defendant, but also under Rule 412(c)(4) "to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented." See Tenn. R. Evid. 412(c)(4).

Five days before the start of the Defendant's trial, the State filed a motion in limine pursuant to Rule 412, to prohibit the defense or its witnesses from presenting any reputation or opinion evidence regarding the sexual behavior of J.J. or any evidence of specific instances of sexual conduct. In this motion, the State asserted that the defense had "provided no notice or written motion at least ten days prior to the beginning date of the trial as required under Rule 412(d)." See Tenn. R. Evid. 412(d). The next day, the defense filed a motion under seal pursuant to Rule 412, stating in part that there was a minor witness who could testify that J.J. made remarks to her of a sexual nature about her mother, which the defense sought to introduce to show that J.J. "had sexual designs on other women who were much older than he." The defense motion also stated that J.J. had made "inappropriate sexual comments to his Spanish teacher, Sandy Marin." The motion claimed that some of

the proposed testimony "could come from witnesses who are either unavailable or have thus far been uncooperative with defense counsel" and that if the defense was unable to produce all of these witnesses, the defense "would request to be allowed to cross-examine the alleged victim about the incidents alleged in this Motion." The same day, the State filed a response to the defense's motion, requesting that the defense motion be dismissed on the basis that none of the specific instances of J.J.'s behavior were admissible under Rule 412(c) and that the defense's motion did not contain an offer of proof regarding this evidence. At a hearing the day before the Defendant's first day of trial, the Defendant's attorney stated that after having some discussions with the prosecutor and based on the proof and the case law on this issue, the defense was going to "strike the motion." The trial court subsequently entered an order striking the Defendant's Rue 412 motion.

During cross-examination of J.J. at trial, defense counsel asked if J.J. knew "a girl named Mackenzie" or "a girl named Alana." When J.J. responded affirmatively, the State asked to approach the bench. Outside the hearing of the jury, the State said that defense counsel "better not ask a question about whether he had some sexual contact with [these girls] because there's been no foundation laid" and "it's not relevant in this case." Defense counsel replied that "the relevance is . . . [J.J.] would make references to different women that were roughly [the Defendant's] age, things like, you know, he thought they were hot, that he would like to have sex with them and things like that." The State asserted that such evidence was "totally not relevant," and defense counsel replied, "Well, her defense is going to be that it wasn't consensual." The trial court then asked, "Are you telling me your defense is going to be that he forced her to have intercourse with him 40 to 50 times?" Defense counsel said, "[H]er defense is going to be that he forced himself on her and after that that he essentially blackmailed her and told her he would tell if she didn't comply. That's what her testimony is going to be." At that point, the trial court excused the jury.

Thereafter, defense counsel explained that the Defendant and others had informed him that J.J. told two girls named Mackenzie and Alana that he thought the girls' moms were "hot" and that he would like to have sex with them. He added that the defense had information that J.J. had made similar comments to Ms. Marin, a Spanish teacher, although Ms. Marin was unwilling to talk to defense counsel. In addition, he claimed he had information that J.J. had made similar comments about Deana Campbell, the Defendant, and Kristina Evans, and that J.J. had actually sexually assaulted Kristina Evans, although Ms. Evans denied this. The trial court cautioned that the defense was "getting into [Rule] 412 issues here[.]" At that point, defense counsel asserted that the Defendant would testify that J.J. "sexually assaulted her" after she had been drinking and that "[J.J.] came in her bedroom, that he essentially forced himself on her" and that "after that incident, [J.J.] would basically hold that over her head and threaten to tell her husband and other people if she didn't consent to have sex with him[.]" The trial court asked if this was basically a duress defense, and the defense counsel responded affirmatively. The trial court stated, "I

- 58 -

think you're getting into [Rule] 412 issues and that is something that we absolutely cannot get into because the parties agreed to that."

The court noted that the defense "withdrew [its Rule] 412 motion" and "the motion was not procedurally timely or procedurally correct." The court then held that the defense could not ask any questions to J.J. regarding "any possible relations or suggestions of relationships" with other women because it was "irrelevant" and "immaterial" to this proceeding. Defense counsel insisted that Rule 412 did not apply to statutory rape by an authority figure and that even if Rule 412 did apply, all of these allegations, except the allegation involving Kristina Evans, came to him less than ten days prior to trial, which was why he filed the motion and then withdrew it. The trial court then stated, "Okay. Thank you. No questions about relations with any other individual, possible relations with any other individual. Intentions or words to that effect are irrelevant or immaterial right now." The court acknowledged that its ruling did not "mean later on they might became material, but . . . the way the proof is developing now, I will not allow any questions down this path." Defense counsel continued to argue for the admissibility of this evidence, referencing the Defendant's "constitutional right to present a defense."

Tennessee's rape shield rule, found in Tennessee Rule of Evidence 412, "was enacted to reflect the general view that evidence of prior sexual behavior is irrelevant or, if relevant, has little probative value compared to its prejudicial effect, unless the evidence is within one of the enumerated exceptions." Brown, 29 S.W.3d at 429-30. Rule 412 "recognizes that despite the embarrassing nature of the proof, sometimes the accused can only have a fair trial if permitted to introduce evidence of the alleged victim's sexual history." Tenn. R. Evid. 412, Advisory Comm'n Cmts (1991). The rule's "purpose is to exclude all evidence regarding the complainant's prior sexual behavior unless the procedural protocol is followed and the evidence conforms to the specifications of the Rule."

As relevant in this case, Rule 412 provides, in pertinent part:

**Specific Instances of Conduct.** Evidence of specific instances of a victim's sexual behavior is inadmissible unless . . . the evidence is:

(1) Required by the Tennessee or United States Constitution, or

(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or

(3) If the sexual behavior was with the accused, on the issue of consent, or

(4) If the sexual behavior was with persons other than the accused, [and is offered]

(i) to rebut or explain scientific or medical evidence, or
(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters . . . .
(iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c). Rule 412(d) states that if a defendant intends to offer reputation or opinion evidence under subsection (b) or evidence regarding the specific instances of conduct of the victim under Rule (c), then the defense must "file a written motion to offer such evidence." Tenn. R. Evid. 412(d). This motion "shall be filed no later than ten days before the date on which the trial is scheduled to begin, except the court may allow the motion to be made at a later date, including during trial, if the court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which such evidence relates has newly arisen in the case." Tenn. R. Evid. (d)(1)(i). In addition, the motion "shall be served on all parties, the prosecuting attorney, and the victim" and "shall be accompanied by a written offer of proof, describing the specific evidence and the purpose for introducing it." Tenn. R. Evid. (d)(1)(ii), (iii).

In this case, the Defendant filed a Rule 412 motion requesting that he be allowed to cross-examine J.J. regarding specific incidents of his sexual behavior but then asked the trial court to strike this motion. Although the Defendant claims that the referenced evidence does not qualify as "sexual behavior" under Rule 412(a), which defines "sexual behavior" as "sexual activity of the alleged victim other than the sexual act at issue in the case," we disagree. The definition of sexual behavior in Rule 412 is deliberately broad to reflect the purpose of Rule 412, which is to "to exclude all evidence regarding the complainant's prior sexual behavior unless the procedural protocol is followed and the evidence conforms to the specifications of the Rule." See Tenn. R. Evid. 412(a). The record shows the defense's Rule 412 motion was untimely and sought to admit specific instances of a victim's conduct that did not fall within exceptions stated in Rule 412(c). Even if the untimeliness of the defense's motion was not an issue, none of the evidence cited by the Defendant would have been admissible under Rule 412(c). Moreover, as to the Defendant's claim that evidence of J.J.'s alleged assault of Kristina Evans was

admissible under Rule 412(c)(4) to prove J.J.'s consent to the offenses in this case, we reiterate that "[c]onsent is not a defense to any form of statutory rape." State v. Collier, 411 S.W.3d. 886, 894 (Tenn. 2013). Because the trial court did not abuse its discretion in limiting the Defendant's attempts to cross-examine J.J. on his alleged interest in older women, the Defendant is not entitled to relief.

**B. Exposure to Inappropriate Sexual Matters in Childhood.** The Defendant also argues that she should have been permitted to cross-examine B.J. about how J.J. was traumatized by his parents being "sex addicts." She asserts that the State opened the door to this line of questioning when it introduced evidence that J.J. had been sent to a therapeutic boarding school in Missouri, which suggested to the jury that J.J. was so traumatized by the Defendant's actions that he had to go to a special school for rehabilitation. She claims the defense should have been able to present evidence regarding J.J.'s parents to show that he "may have had traumas in addition to (or perhaps even instead of) [the] harm from [her]."

On cross-examination, B.J. testified he and his wife had had custody of J.J. since J.J. was two-and-a-half years old. B.J. acknowledged that J.J. had been exposed to things that that no little child should have to endure. Defense counsel then asked, "And part of that is a result of both his parents were sex addicts?" The State objected on the basis that there had been no testimony regarding that issue at any point in time during this trial, and the trial court sustained the objection. Defense counsel approached the bench and asked to make an offer of proof, and the trial court excused the jury from the courtroom.

During the ensuing hearing, which was outside the jury's presence, defense counsel explained that in the discovery provided by the State, B.J. said during an interview with police that J.J. had been "exposed to some things that no child that age should be exposed to" and then B.J. said that "both of [J.J.]'s parents were sex addicts." Defense counsel argued that this evidence regarding J.J.'s parents was "relevant" because the State had presented proof that J.J. was currently enrolled in a therapeutic boarding school in Missouri, which left the impression with the jury that all of J.J.'s problems were related to the Defendant. Consequently, defense counsel argued that he should be allowed to explore what sort of trauma J.J. endured when he was a young child. The State asked if defense counsel was trying to argue that "a two-and-a-half-year-old . . . learn[ed] to be a sex addict at two-and-a-half," and the trial court replied that it believed the argument was that J.J. had suffered trauma not only because of the Defendant's actions but also because of the trauma J.J. experienced when he was a young child.

The State then asserted that although J.J. had been available for cross-examination, the defense never asked him these questions about his parents, and the defense was trying to "get it backdoored" through B.J., J.J.'s uncle. Defense counsel said he did not know

whether J.J. knew about his parents being sex addicts, and the trial court questioned whether J.J. could be traumatized from his parents being sex addicts if J.J did not know this about his parents. Defense counsel also claimed that he had been unable to interview B.J. because B.J.'s private counsel had denied his request. He said that he did not know when this "trauma" to J.J. actually occurred, but right after B.J. made the statement to police about this trauma, B.J. said that J.J.'s parents were sex addicts, which led defense counsel to believe that there was "some connection" between the two statements that he wanted to explore with B.J. The trial court sustained the State's objection, stating, "I think whether or not [J.J.'s] parents were sex addicts has nothing to do with this, especially since [J.J.] was two years old. I think you can ask, and I think it's already been brought up, [that] the reason that [J.J.] came to live with [B.J.] was that he had some issues and experienced trauma, and that's all that needs to be said."

During the offer of proof allowed by the trial court on this issue, defense counsel asked B.J. what he meant when he told the detectives that J.J. was exposed to some things that no child should have to endure, and B.J. replied, "Specifically drugs." B.J. then explained that both of J.J.'s parents were using drugs. When defense counsel asked about whether B.J. said that both of J.J.'s parents were sex addicts, B.J. said he "had no knowledge of [J.J.]'s mother being diagnosed as a sex addict." B.J. acknowledged that J.J.'s father had been diagnosed as a sex addict but asserted that he was not aware of J.J. being exposed to anything as a result of J.J.'s father being a sex addict. The trial court held that B.J.'s testimony during the offer of proof was not relevant to this jury trial and that B.J.'s testimony just showed that J.J. "had some trauma when he was a child and he came to live with his aunt and uncle when he was two-and-a-half[.]" Defense counsel asked if he could ask B.J. if J.J. came to live with him because his parents were on drugs, and the trial court held that it was irrelevant.

When the jury returned to the courtroom, the trial court instructed the jury that it had "sustained the objection regarding [J.J.'s] being exposed to sex addicts as parents," that it was "striking that [evidence] from the record" and that the jury was "not to . . . consider anything about that particular statement." When cross-examination resumed, defense counsel asked if J.J. had been in a "bad situation" and came to live with B.J. as a "small child" and B.J. replied affirmatively and confirmed that J.J. had been living with his family ever since then.

When this issue was considered at the motion for new trial hearing, the trial court held that evidence regarding whether the alleged victim was exposed to inappropriate sexual matters in childhood related to his parents being allegedly diagnosed as sex addicts was "completely, totally irrelevant and prejudicial.

We conclude that B.J.'s responses during the offer of proof make it clear that any evidence in response to such questions would have been irrelevant. See Tenn. R. Evid. 401. Moreover, the jury was able to hear that J.J. had been in an unacceptable home environment, which was why he came to live with B.J. and K.J. Because the trial court did not abuse its discretion in limiting the Defendant's attempts to cross-examine B.J. on this issue, the Defendant is not entitled to relief.

**VI.** **Sentencing.** The Defendant argues that her twenty-four-year sentence is excessive. Specifically, she claims that the trial court erred in sentencing her to the maximum sentence for each conviction by erroneously applying all three enhancement factors and that the trial court erred in imposing consecutive sentencing. In response, the State contends that this court should presume that the sentencing determinations were reasonable because the trial court imposed within-range sentences after applying the appropriate sentencing factors, which were supported by the record. We agree with the State.

At the Defendant's sentencing hearing, the trial court determined that the Defendant was a Range I offender and that the range of punishment for Counts 1 and 3, which were Class B felonies, was eight to twelve years without the possibility of probation. See Tenn. Code Ann. §§ 40-35-112(a)(2), 39-13-532(b). It then found that the range of punishment for Counts 2, 4, and 5, which were Class D felonies, was two to four years. See id. §§ 40-35-112(a)(4), 39-13-506(d)(3). The presentence investigation report, including the victim impact statements, as well as approximately twenty letters in support of the Defendant were admitted into evidence.

K.J., J.J.'s aunt, testified that the Defendant "made [J.J.] a part of [her] family" and then "took that love . . . to someplace it should have never gone." She claimed that the Defendant "made [J.J.] do things that he should have never been tempted to do or asked to do or expected to do or be put in a position to do." She also said the Defendant "groomed" J.J. and then "lied about it." K.J. stated that J.J. was currently in a Christian treatment facility in Missouri and that J.J. had "regress[ed]" after seeing the Defendant at trial and was currently having nightmares, insomnia, and flashbacks. K.J. asserted that J.J. was "going to be damaged for the rest of his life" and that he was "going to need treatment for the rest of his life."

B.J., J.J.'s uncle, testified that the "most disturbing" thing was that although the Defendant initially admitted responsibility for what happened, at trial the Defendant blamed J.J. He said the Defendant testified at trial that she "drank too much" and that J.J. "raped" her. B.J. noted that although the Defendant's crimes turned his "whole family upside down," "turned the church upside down," and turned the Defendant's "family

upside down," the only time the Defendant took responsibility for what she had done was the first night that the allegations were discovered."

Ken Castleberry, the senior pastor at Parkway Baptist Church, testified that he knew the Defendant through her parents, who had attended his church for many years. He said that the Defendant was "a positive influence" and that he would vouch for her character and honesty and integrity. Although Castleberry said that the Defendant was very remorseful for her actions, he admitted he did not know that the Defendant testified at trial that J.J., a fourteen-year-old, raped her and then blackmailed her into continuing to have a sex with him.

Donna Smith, the Defendant's aunt, testified that the Defendant was "an awesome mother" who "raised all of her children in church" and that the Defendant's offenses were "totally out of character[.]" Smith noted that the Defendant had started a Bible study with other inmates that had grown to twelve members and that prior to this case, the Defendant had raised more than $10,000 for her church. She said that the Defendant's children were "devastated" by the Defendant's charges and convictions and that she did not "see how breaking up a family would serve the community well."

Larry Smith, the Defendant's uncle, testified that the Defendant was "remarkable" in her ability to raise and donate more than $10,000 to her church. He said despite this case, he would vouch for the Defendant's character, honesty, and integrity because he believed that the Defendant had "repented" and was "remorseful."

Mike Burns, the Defendant's father, testified that the Defendant had accepted responsibility for her offenses and had apologized to him and to her mother. He stated his desire for the Defendant's family to remain "intact."

The Defendant's daughter testified that although J.J. had caused "some trauma[,]" the Defendant had "helped her through it" and had prayed with her and for her. She said that her younger siblings needed their mother and that she did not want their family "torn apart[.]"

The Defendant's twenty-two-year-old son testified that "academically, emotionally, spiritually," he would not be the man he was today without the Defendant's "guidance and leadership." He asked the court for leniency for his mother for the benefit of his younger siblings.

The Defendant's teenage son testified that the Defendant was "the most loving, caring mom ever." He said that he would not be where he was spiritually without his mother.

Jennifer Woodard, who was responsible for supervising the Defendant while on bond, testified that the Defendant had complied with the conditions of her house arrest. However, she stated that the Defendant had violated the conditions of her bond on two different occasions before she was ultimately placed on house arrest. Woodard explained that in December 2017, the Defendant told her daughter to give an extra chicken sandwich to J.J., the victim in this case, and that in March 2018, the Defendant had lunch with her children at school after being ordered to have no contact with minors, which resulted in the Defendant's bond being increased to $200,000 and the Defendant being placed on house arrest. In addition, Woodard said that close to the time of the Defendant's trial, law enforcement informed her that the Defendant had failed to return directly home after she was released from house arrest for a doctor's appointment.

Brian Tice, the Defendant's husband, testified that he and the Defendant still had five children living at home. He said that the Defendant was "an amazing person and mother" and was always "serving others," volunteering, and fund-raising. He also noted that the Defendant had been a "leader to those women in jail" and that the Defendant had "never, ever been in trouble with the law" prior to this case. Brian maintained that the Defendant and their daughter had gone through "more emotional, verbal, and sexual abuse than they should have [had] to ever [endure][.]" He asserted that the Defendant's "sterling reputation" had been "dragged through the mud" and that there were "many lies and untruths in the media" about this case. Nevertheless, he admitted that he had been concerned about how close the Defendant was to J.J. and that he had asked the Defendant to limit her contact with J.J. prior to the Defendant's trip to North Carolina. He claimed the Defendant was wrongfully convicted.

The Defendant provided an allocution. She apologized to the court, the prosecutors, J.J., J.J.'s family, her husband, her family, and God. She said that "the relationship" with J.J. was something she "wish[ed] had never happened" and that if she could go back in time, she "would never allow it to happen." The Defendant said she was "truly sorry for everything that has happened and to everyone involved."

At the conclusion of this hearing, the trial court recognized that until the Defendant committed the offenses in this case, she had "led a very productive, great life of discipleship as a Christian[.]" It noted that while "[f]orgiveness involve[d] restored relationships," "[j]ustice involved the application of the rule of law." The court stated that justice required truth and that the problem in this case was that the truth was "distorted, . . . bent, . . . minimized, [and] justified[.]"

In determining the appropriate sentence for the Defendant, the trial court considered the "evidence presented at the trial and the sentencing hearing," "the presentence report," "the principles of sentencing[] and arguments as to sentencing alternatives," "the nature

and characteristics of the criminal conduct involved," "the evidence and information offered by the parties on mitigating and enhancement factors," "any statement the [D]efendant made, . . . on her own behalf about sentencing," and "her potential for rehabilitation or treatment." See id. § 40-35-210(b). The trial court also considered the more than twenty letters, including four letters from inmates, that were submitted in support of the Defendant.

The trial court applied several enhancement factors to the Defendant's sentences. In applying enhancement factor (4), the court stated, "Now, something has to be different other than the normal 14-year-old, but in this particular case the victim was particularly vulnerable because of [his] age and the environment that existed with the [D]efendant and her family." See Tenn. Code Ann. § 40-35-114(4). In applying enhancement factor (7), the court found that "the offense involved the victim and was committed to gratify the [D]efendant's desire for pleasure or excitement." See id. § 40-35-114(7). The court applied these two enhancement factors to all five of the Defendant's convictions. In addition, the trial court also applied enhancement factor (14) to Counts 2, 4, and 5 because the Defendant "abused the position of private trust in a manner that significantly facilitated the commission or fulfillment of the offense." See id. § 40-35-114(14). In considering the mitigating factors, the trial court found that the Defendant had "a good family" and "no criminal record." See id. § 40-35-113(13).

The trial court also recognized that it must order "a sentence justly deserved in relation to the seriousness of the offense." See State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(1)). The court noted that the Defendant's crimes affected the victim's and the Defendant's families; the church, specifically Metro Baptist Church; and the government, because laws had been violated, which meant that the Defendant's offenses affected "every institution that's set up for the ordering of society[.]" In considering the seriousness of the Defendant's offenses, the trial court stated:

> Now, just how serious is one year of sexual conduct with a 14-year-old boy when you are 37, when you are the mother of the girlfriend of the victim, you are a youth church leader, and you are a substitute teacher? Just how serious is that?
>
> How serious is sexual conduct in this particular instance occurring many times, many locations? It continued until it was stopped. And I don't know how long it would have gone on if this hadn't have come up, if we hadn't had the Mallards, if we hadn't had intervention here. And immediately the defendant began to react in truthfulness, but something happened and it changed into a life of lies that was manifested at trial and still continues to this date. So just how serious is that[?]

- 66 -

The damage, it can't be calculated in human terms. Victim, he's now at a therapeutic boarding [school] in the state of Missouri. You've seen the victim impact statement. The victim's family, [B.J.], [K.J.], the aunt and uncle who raised him, and yet when they found out about the situation, the defendant wouldn't answer the questions on the phone. What do you have to think about? It's either true, [Defendant], or it's not true.

The trial court also recognized the damage the Defendant had done to her daughter, stating, "By the grace of God, she's recovered from what you did with her boyfriend." In addition, the court recognized the damage the Defendant had done to her husband, her family, and her church. The court noted that the Defendant's case was "one of the most unusual crimes and situations that [it had] ever heard in this courtroom."

Regarding the Defendant's spirituality, the trial court recalled that the Defendant had told K.J. that she was trying to enrich J.J. in the Lord and to take him to places spiritually. The court said, "When I compare that with wolves in sheep's clothing, what places can he find with you in intercourse and oral sex? That's why I have a hard time with your spirituality."

The trial court said it must consider whether the "punishment [is] sufficient to prevent crime and promote respect for the law." See id. at 343 (citing Tenn. Code Ann. § 40-35-102(3)). The court found that the Defendant's crimes had "indirectly involved the school and the church" and "directly involved two homes, different neighborhoods, countless friends." With considering the need for deterrence for these offenses, the court asserted that it must impose a sentence that "preserves respect for all children, . . . everywhere."

Lastly, the trial court stated that it must consider "the defendant's potential or lack of potential for rehabilitation." See id. at 343 (citing Tenn. Code Ann. § 40-35-103(5)). It noted that the Defendant told Wendy Mallard about the affair but did not tell her until later that the Defendant was having an affair with her daughter's boyfriend. The court recalled that the Defendant told Wendy Mallard about the first time the Defendant and J.J. had sex while her family was out of town and about how the Defendant said it was the "best sex ever" and how "giddy," "happy," and "excited" the Defendant was as she was telling her about the affair. It noted that the Defendant had told Wendy Mallard that the Defendant had sex with J.J. in "hotel rooms, vehicle, every room in the house," about how "the victim was well endowed[.]" The trial court emphasized that the Defendant never said she was forced by the victim to engage in sex and that the proof actually showed that the Defendant would help J.J. with his chores in the barn so he would go with her. The trial court found that the Defendant's claims that alcohol affected what she said to Wendy Mallard was "[b]aloney, absolute baloney" and that if she was the spiritual person that she claimed, then

why was the Defendant drinking alcohol. Then the trial court made the following observations about the Defendant's potential for rehabilitation:

> You've lied so much about this that you can't distinguish between truth and lie and your sensitivity to lies and untruths in this particular area has almost deadened.

> . . . .

> [Defendant], you couldn't even be on bond in this case without violating the bond conditions. Three times we heard today that you violated the condition of your bond, and one time I had to raise your bond.

> You do not accept responsibility. "I'm sorry" is not going to get it. You blame others, you blame the victim, your husband blames the church, or you blame other things like alcohol. It's not going to cut it, not going to cut it.

> There is [the] seriousness of the crime, there is [the need for] a deterrent effect, and there is a large concern by this Court for effective rehabilitation while you've living a lie in your mind about one year of your life up to this point.

After making these detailed findings, the trial court imposed a sentence of twelve years with a release eligibility of thirty percent in Count 1 and Count 3. The court then imposed a sentence of four years with a release eligibility of thirty percent in Counts 2, 4, and 5. With regard to Code section 40-35-103(1)(B), the court concluded that "confinement is necessary to avoid depreciating the seriousness of the offense or provide an effective deterrence to others likely to commit similar offenses." The trial court specifically held that children at school and at church needed to be protected from sexual abuse.

As for whether the sentences would be served concurrently or consecutively, the trial court held that because the Defendant had been "convicted of two or more statutory offenses involving sexual abuse with a minor," it must consider "the aggravating circumstances arising from the relationship between the defendant and the victim[,]" "the time span of the defendant's undetected sexual activity," "the nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victim[.]" See Tenn. Code Ann. § 40-35-115(5).

The court determined that the "aggravated circumstances" arising from this relationship were that the victim was fourteen years old and the Defendant was thirty-seven years old when the criminal conduct began and that the victim was the boyfriend of the Defendant's daughter. In addition, the court found that the Defendant was "a leader at the church over the victim's age group," that the Defendant was "a substitute teacher at [the church's] school over the victim's age group," and that the Defendant "became a mother figure to the victim[.]" The trial court also noted that "some grooming [of the victim by the Defendant]" occurred because the Defendant told the victim that she loved him, that he was one of her children, that he was special. The court found that the Defendant called to see if the victim could spend the night and helped the victim work in the barn so that the victim could leave and be with her. In addition, the trial court recognized once these allegations came to light, the Defendant "lied to cover it up" and "placed the blame on the victim." It stated that the Defendant "victimized this child [who was] 14 years old" and then "victimize[d] him again through what [the Defendant] said . . . under oath in this Court, not telling the truth." The trial court concluded that because the Defendant had continued "excusing" her own conduct and "blaming" the victim for what happened, the Defendant had a very poor potential for rehabilitation.

The trial court determined that "the time span of the defendant's undetected sexual activity" was one year, from December 2016 to November 2017 while the victim was fourteen and fifteen years old and the Defendant was thirty seven years old.

Regarding "the nature and scope of the sexual acts and the extent of residual, physical and mental damage to the victim[,]" the trial court said the case included "everything from sexual intercourse to oral sex; arranging opportunities, [having sex at the Defendant's] house, . . . every room in [the Defendant's] house, [the Defendant's] van, [the victim's] house, [the victim's] barn, bedroom, hotel at Rivergate—too many times to count." There was evidence that these sexual acts occurred "40 to 50 times" and other proof that the sexual acts occurred "20 times, up and down various roads" and "on one occasion, bondage." In addition, the trial court said that "[t]he damage [to J.J.] cannot be measured." The court summarized the contents of the victim impact letters, which detailed the Defendant's decision to blame J.J. for her criminal acts; J.J.'s extensive psychological treatment at Vanderbilt Psychiatric Hospital, Babb Center in Hendersonville, and Shelterwood in Independence, Missouri; J.J.'s diagnosis of post-traumatic stress disorder and depression; and J.J.'s attempted suicide with a gun.

Based on these exhaustive findings, the trial court ordered the twelve-year sentences in Counts 1 and 3 served concurrently with one another; it then ordered the four-year sentences in Counts 2, 4, and 5 served consecutively to one another and consecutively to the sentences in Counts 1 and 3, for an effective sentence of twenty-four years in confinement with release eligibility after service of thirty percent of the sentence. See id.

The trial court also ordered the Defendant to have no contact with the victim or the victim's family, to register as a violent lifetime sex offender, and to pay a $200 fine for each conviction.

At the motion for new trial hearing, the trial court held that the transcript from the sentencing hearing would show that it went "through a pattern that satisfied the legal requirements for any sentence." The court summarized the findings it made at the conclusion of the sentencing hearing and then stated, "I don't know how a record could be in more detail than that." As a result, the trial court found the Defendant's grounds regarding sentencing "not well-taken."

Although the Defendant urges us to adopt the federal system's "harmless error" approach outlined in United States v. Gillis, 592 F.3d 696, 699 (6th Cir. 2009), we are bound by the standard of review firmly established in State v. Bise, 380 S.W.3d 682 (Tenn. 2012). Under Bise, id. at 707, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."

The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." Id. at 708. In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. The amendments to the sentencing act also "rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id. Although the application of these factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." Tenn. Code Ann. § 40-35-210(b)(5). In addition, the trial court must place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." Id. § 40-35-210(e).

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Id. § 40-35-210(b).  The defendant has the burden of showing the impropriety of the sentence on appeal.  Id. § 40-35-401, Sentencing Comm'n Cmts.  The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]"  Id. § 40-35-102(1).  The court must also consider the defendant's potential for rehabilitation or treatment.  Id. §§ 40-35-102(3)(C), -103(5).  In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed."  Id. §§ 40-35-103(2), (4).

When determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Id. § 40-35-210(c).

**A.  Enhancement Factors.**  The Defendant asserts that the trial court misapplied all three of the enhancement factors in this case.  She asserts that because her sentence was excessive and inconsistent with the purposes and principles of the relevant statutes, this court "should reduce the sentences for each count to the minimum of the sentencing range."  In addition, without fully considering the holding in Bise, the Defendant claims the trial court failed to "state the specific facts supporting each enhancement factor found" and failed to "articulate how the mitigating and enhancement factors ha[d] been evaluated and balanced in determining the sentence."  State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000).  She asserts that because no enhancement factors applied under the facts in the

- 71 -

record, her sentence was "substantively excessive" and inconsistent with the purposes and principles of the sentencing act, even under the harsh standard established in Bise.

First, the Defendant contends that the trial court erred in applying enhancement factor (4), that "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability," to all five of her convictions. See Tenn. Code Ann. § 40-35-114(4). She asserts that the trial court did not explain what this "the environment that existed with the [D]efendant and her family" was or how this "environment" affected J.J.'s "age or physical or mental disability." While the Defendant acknowledges that there was proof that J.J. had a difficult childhood and had suffered "trauma," she asserts that there was no evidence that J.J. had any particular "physical or mental disability." She also argues that J.J.'s age was an essential element of the offenses and that there was no proof that J.J. had a physical or mental limitation that would have made him unable to resist, call for help, or testify. The Defendant insists that the "uncontroverted evidence" was that J.J., at the time in question, was 5'10" and 175 pounds while the Defendant was 5'4" and 120 pounds and that "[i]f anything, their relative physical conditions supported [the Defendant]'s testimony that [J.J.] had coerced her into the sexual relationship rather than the other way around."

With regard to enhancement factor (4), it is the State's burden to prove that the victim's limitations rendered him or her particularly vulnerable. State v. Osborne, 251 S.W.3d 1, 27 (Tenn. Crim. App. 2007). Whether a victim is "particularly vulnerable" for the purposes Code section 40-35-114(4) is "a factual issue to be resolved by the trier of fact on a case by case basis." State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997) (citation and internal quotation marks omitted). Use of this enhancement factor is appropriate if the facts show that the vulnerabilities of the victim had some bearing on or a logical connection to the victim's "'inability to resist the crime, summon help, or testify at a later date.'" State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting Poole, 945 S.W.2d at 96); see Kissinger, 922 S.W.2d at 487. "[Y]outh does not necessarily equate with vulnerability" and the State must present "evidence in addition to the victim's age to establish particular vulnerability," although this evidence does not have to be extensive. Lewis, 44 S.W.3d at 505; see Poole, 945 S.W.2d at 98 ("[U]nless the State produces evidence of physical or mental limitations at the time of the offense, along with proof of the victim's age, it cannot be presumed that the victim was particularly vulnerable based solely on her age."); State v. McKnight, 900 S.W.2d. 36, 54 (Tenn. Crim. App. 1994) (stating that although age is an essential element of many crimes, it does not make Code section 40-35-114(4) inapplicable because this enhancement factor has more to do with the natural physical and mental limitations of the victim than the victim's age), overruled on other grounds by State v. Collier, 411 S.W.3d 886 (Tenn. 2013). "[T]he court must consider all of the facts and circumstances of the offense in determining whether the particular vulnerability factor is appropriate for the offense." Poole, 945 S.W.2d at 97.

At the sentencing hearing, the trial court applied enhancement factor (4) to all five convictions, stating, "Now, something has to be different other than the normal 14-year-old, but in this particular case the victim was particularly vulnerable because of [his] age and the environment that existed with the [D]efendant and her family." See Tenn. Code Ann. § 40-35-114(4). After carefully evaluating the record, we conclude that it contains sufficient evidence, in addition to J.J.'s age, to support the trial court's application of this enhancement factor. The State presented ample proof at trial that J.J. experienced trauma at a very young age, which resulted in the court system removing J.J. from his parents and sending him to live with his aunt and uncle, K.J. and B.J. In addition, evidence was presented that J.J. felt the absence of his parents in his life and thought of the Defendant as a mother, which is why the trial court specifically referenced "the environment that existed with the [D]efendant and her family." During the sentencing hearing, K.J. testified that the Defendant "made [J.J.] a part of [her] family" and then "led [J.J.] on" and "groomed him[.]" Our review of the record shows that the State presented sufficient evidence that J.J.'s tragic family history made him more vulnerable and contributed to his inability to resist the offenses in this case. Accordingly, we conclude that the trial court acted within its discretion in applying enhancement factor (4).

Second, the Defendant argues that the trial court erred in applying enhancement factor (7), that "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, " to all five counts. See Tenn. Code Ann. § 40-35-114(7). She claims that "the trial court's conclusory statements that th[is] factor applied—without further discussion or analysis" indicates that this court mistakenly believed that all sexual offenses are done for "pleasure or excitement." In addition, she asserts that the trial court seemed to "overlook[] the fact" that both the Defendant and J.J. testified that the Defendant sometimes cried after their sexual encounters, which she claims "is strong evidence that [the Defendant] did not derive 'pleasure or excitement' from the acts." Lastly, the Defendant contends that there was insufficient proof of "pleasure or excitement" in the five offenses resulting in conviction beyond the inherent "pleasure or excitement" the legislature would have considered in classifying the underlying offenses.

In determining whether to apply enhancement factor (7) to sexual offenses, the trial court must consider the defendant's "motive for committing the offense." State v. Arnett, 49 S.W.3d 250, 261 (Tenn. 2001) (citing Kissinger, 922 S.W.2d at 490). "[P]roper application of factor (7) requires the State to provide . . . objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault." Id. at 262. Such evidence may include, but is not limited to "sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment of the sheer violence of the rape." Id. (citations omitted).

- 73 -

As to enhancement factor (7), the trial court made no findings of fact beyond its mere recitation that "the offense involved the victim and was committed to gratify the [D]efendant's desire for pleasure or excitement." While the trial court did not specifically identify the facts on which it relied in finding that the Defendant had unlawful sexual penetration with J.J. to gratify her desire for pleasure or excitement, it did note that the Defendant told Wendy Mallard about the first time she and J.J. had sex while the Defendant's family was out of town, and about how the Defendant said it was the "best sex ever" and how "giddy," "happy," and "excited" the Defendant was as she was telling her about the affair, about how the Defendant had sex with J.J. in "hotel rooms, vehicle, every room in the house," and about how the Defendant said "the victim was well endowed[.]" See State v. Jones, 953 S.W.2d 695, 699 (Tenn. Crim. App. 1996) (concluding that the trial court did not err in applying enhancement factor (7) when the defendant "treated his daughter as if she were his girlfriend"). J.J. and K.J. also testified that the Defendant was relentless in her efforts to see J.J. and would create opportunities for them to be alone. Accordingly, we conclude that the trial court acted within its discretion in applying enhancement factor (7).

Third, the Defendant argues that the trial court erred in applying enhancement factor (14), that "[t]he defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense," to her convictions for aggravated statutory rape in Counts 2, 4, and 5. See Tenn. Code Ann. § 40-35-114(14). She asserts that the trial court applied this factor without explanation. She also notes that the jury acquitted her of the charge of statutory rape by an authority figure in Counts 2, 4, and 5, and instead convicted her of the lesser included offense of aggravated statutory rape, which she claims "is the same crime but without the 'position of trust' element." The Defendant acknowledges that this jury determination does not preclude application of this enhancement factor. See Winfield, 23 S.W.3d at 283 ("[A] sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence." (footnote omitted)); cf. State v. Daniel Clarke Doyle, No. W2012-02745-CCA-R3-CD, 2014 WL 217299, at *1, *6-8 (Tenn. Crim. App. Jan. 17, 2014) (stating that a trial court could consider the defendant's position of trust as a teacher at the victim's school as a factor in denying judicial diversion when the original indicted offense was statutory rape by an authority figure and the defendant plead guilty to statutory rape). Nevertheless, the Defendant urges this court to consider the jury's decision to acquit her of the charged offenses of statutory rape by an authority figure when determining whether the evidence preponderates against the trial court's application of this factor. Lastly, the Defendant argues that the State failed to prove she attained a "position of trust" at the time the sexual acts in these counts occurred.

In Kissinger, 922 S.W.2d at 488, the Tennessee Supreme Court recognized that "[t]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples" of positions of public or private trust for the purpose of applying enhancement factor (14). It stated that "[t]he determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship" and that the court should consider "whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith." Id. If the evidence supports a finding that the defendant occupied a position of public or private trust, then the court must determine whether the position occupied was abused by the commission of the offense. Id.

Here, the evidence establishes not only that the Defendant had attained a position of trust in J.J.'s life when the offenses in Counts 2, 4, and 5 occurred but also that the Defendant abused her position of trust in a way that significantly facilitated the commission of these offenses. J.J., Dawn Lesueur, K.J., and even the Defendant testified that J.J. thought of the Defendant as a surrogate mother. Substantial proof was presented that the Defendant went to great lengths to include J.J. in family events and activities. At the time of these offenses, the Defendant was the mother of J.J.'s girlfriend, a surrogate mother, a youth leader over J.J.'s age group at church, and a close family friend of J.J.'s family. Despite the jury's verdicts convicting the Defendant of the lesser included offense of aggravated statutory rape in these counts, the facts supporting this enhancement factor were established in the record by a preponderance of the evidence, and the trial court acted within its discretion in applying this factor based on overwhelming evidence that the Defendant abused a position of both public and private trust in a manner that significantly facilitated these offenses. See Winfield, 23 S.W.3d at 283. Accordingly, we conclude that the record fully supports the trial court's application of enhancement factor (14) to the sentences in Counts 2, 4, and 5.

**B. Consecutive Sentencing.** The Defendant also argues that the trial court abused its discretion in imposing a partially consecutive sentencing alignment. Noting that the trial court ordered the three convictions for aggravated statutory rape served consecutively to one another. and consecutively to the two convictions for statutory rape by an authority figure, the Defendant asserts that "the trial court simply disagreed with the jury's acquittal of [the Defendant] on three of the 'Authority Figure' charges and functionally punished her as if the jury had found her guilty as charged on all five counts." Consequently, she argues that the "aggregate maximum" sentence is not reasonably related to the severity of the offenses for which the jury found her guilty. See State v. Taylor, 739 S.W.2d 227, 230 (Tenn. 1987) ("[W]e caution that consecutive sentences should not routinely be imposed in sexual abuse cases, or in other cases, and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved."). The Defendant also argues that the consecutive sentencing alignment was inappropriate because she has

no prior criminal history. For all these reasons, the Defendant urges this court to order all her sentences served concurrently, or alternatively, to order all the aggravated statutory rape convictions served concurrently to one another or concurrently to the two convictions for statutory rape by an authority figure.

In Pollard, the Tennessee Supreme Court held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see Bise, 380 S.W.3d at 708; State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The court explained that "the presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court relied on Code section 40-35-115(b)(5), which permits the imposition of consecutive sentences when "[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor" so long as the trial court considers "the aggravated circumstances arising from the relationship between the defendant and victim . . . , the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical, and mental damage to the victim[.]" Tenn. Code Ann. § 40-35-115(b)(5); see State v. Doane, 393 S.W.3d 721, 738 (Tenn. Crim. App. 2011) (recognizing that not all of the aggravated circumstances listed in section 40-35-115(b)(5) must be present to support the trial court's imposition of consecutive sentencing).

We conclude that the trial court did not abuse its discretion in imposing an aggregate sentence of twenty-four years. See State v. David Lamar Hayes, No. M2002-01331-CCA-R3-CD, 2004 WL 1778478, at *9 (Tenn. Crim. App. Aug. 9, 2004) (noting that "[t]his court has often upheld consecutive sentencing with lengthy terms of incarceration relating to convictions for multiple sexual offenses"); State v. James Allen Perry, No. E2015-01227-CCA-R3-CD, 2016 WL 2901817, at *4 (Tenn. Crim. App. May 13, 2016)

(affirming the imposition of partially consecutive sentences for numerous sexual offenses committed against a minor).

Here, the trial court carefully considered the purposes and principles of the sentencing act and provided exhaustive findings regarding each and every one of the aggravated circumstances in Code section 40-35-115(b)(5). We agree that the offenses in this case were appalling. The evidence showed that the Defendant blatantly abused her position of trust with J.J. and his family in order to commit these offenses and then blamed the victim for these offenses at trial. Because the trial court properly articulated reasons for imposing partially consecutive sentences and followed the purposes and principles of the sentencing act, the Defendant is not entitled to relief.

**VII. Cumulative Error Doctrine.** Lastly, the Defendant asserts that the errors committed at trial collectively deprived her of a fair trial under the cumulative error doctrine. In response, the State argues, and we agree, that the Defendant is not entitled to relief because she failed to establish that any error occurred.

The cumulative error doctrine "is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77. Because we have concluded that there were no errors committed during the trial proceedings in this case, the Defendant is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

Based on the aforementioned authorities and reasoning, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE